# No. 21-800

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

_____

STEVEN DOUGLAS COLEMAN,
*Appellant,*
v.
MARIA KIM GRAND,
*Appellee.*

_____

On Appeal from the United States District Court
for the Eastern District of New York

Case No. 1:18-cv-5663 (ENV) (RLM), Hon. Eric N. Vitaliano, U.S.D.J.

_____

**OPENING BRIEF OF PLAINTIFF-APPELLANT
STEVEN DOUGLAS COLEMAN**


Steven M. Richman, Esq.
*Lead Counsel*
Giel Stein, Esq.
Elizabeth Griffin, Esq.

CLARK HILL PLC
830 3rd Ave #200
New York, NY 10022

# **TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................i

TABLE OF AUTHORITIES ......................................................... iii

FRAP 28(**a**)(4) STATEMENT OF JURISDICTION ...............................1

STATEMENT OF THE ISSUES.....................................................1

2d Cir. LOCAL RULE 28.1(b) SUMMARY .....................................2

SUMMARY OF ARGUMENT .....................................................13

STANDARD OF REVIEW .........................................................14

ARGUMENT ........................................................................15

I.    The district court erred by applying the NY Statute. ..........15

    A.    The district court never gave Coleman an opportunity to brief the NY Statute's applicability. ................15

    B.    The district court's application of the NY Statute conflicts with the Federal Rules and violates the Seventh and Fourteenth Amendments. ....................17

II.    Even if the NY Statute were held to apply despite this Court's *La Liberte* decision, then it was error to give it retroactive effect..................................................14

III.    The district court erred in finding that Grand addressed a matter of public interest in her limited distribution of her Email and her Letter. ...........................................30

IV.    The district court erred in finding no genuine issue of material fact as to whether Grand's statements met the actual malice standard. ........................................35

V.    The district court erred in finding as a matter of law that certain statements were opinion and not fact. ....................45

i

CONCLUSION ........................................................................................50

CERTIFICATE OF SERVICE ................................................................52

CERTIFICATE OF COMPLIANCE.......................................................52

ii

# TABLE OF AUTHORITIES

## CASES

*161 Ludlow Food, LLC v. L.E.S. Dwellers, Inc.*,
    107 N.Y.S.3d 618 (N.Y. Sup. Ct. Apr. 23, 2018) (Slip Copy),
    *aff'd*,176 A.D.3d 434 (1st Dept. 2019)..........................................................23

*Abbas v. Foreign Policy Grp., LLC*,
    783 F.3d 1328 (D.C. Cir. 2015).............................................................. 17, 24

*Alianza Dominicana, Inc. v. Luna*,
    229 A.D.2d 328 (1st Dept.1996), motion for leave to app. dism.,
    89 N.Y.2d 1029........................................................................................ 46, 47

*Am. Trucking Assn's v. Smith*,
    496 U.S. 167 (1990)........................................................................................24

*Calder v. Jones*,
    465 U.S. 783 (1984)........................................................................................23

*Carbone v. Cable News Network, Inc.*,
    910 F.3d 1345 (11th Cir. 2018) ................................................... 17, 19, 20, 24

*Celle v. Filipino Rep. Enterprises Inc.*,
    209 F.3d 163 (2d Cir. 2000) ........................................................... 36, 45, 46

*Chapadeau v. Utica Observer-Dispatch*,
    38 N.Y.2d 196 (1975)............................................................................ 28, 31

*Chiavarelli v. Williams*,
    256 A.D.2d 111 (1st Dept. 1998) ..................................................................47

*Coleman v. Grand*,
    -- F. Supp. 3d --, No. 18CV5663ENVRLM, 2021 WL 768167
    (E.D.N.Y. Feb. 26, 2021) .................................................................................6

*Cummings v. City of New York*,
    No. 19-cv-7723, 2020 WL 882335 (S.D.N.Y. Feb. 24, 2020).....................48

*Curtis Publ'g v. Butts*,
    388 U.S. 130 (1967)........................................................................................43

CLARKHILL\K3597\421993\263402005.v5-7/6/21

*Davis v. Cox,*
    351 P.3d 862 Wash.2d 269 (Wash. 2015) ....................................22

*Eastern Enter's v. Apfel,*
    524 U.S. 498 (1998)..............................................................30

*Edwards v. Martin,*
    158 A.D.3d 1044 (3d Dept. 2018) ..................................21

*Erie R.R. v. Tompkins,*
    304 U.S. 64 (1938)...............................................................18

*Fairley v. Peekskill Star Corp.*
    83 A.D.2d 294 (2d Dept. 1981) ................................. 32, 33

*Gatz v. Otis Ford, Inc.,*
    262 A.D.2d 280 (2d Dept. 1999 ...................................49

*Godin v. Schencks,*
    629 F.3d 79 (1st Cir. 2010) (Maine)...................... 17, 18

*Goldman v. New York Post Corp.,*
    58 A.D.2d 769 (1st Dept. 1977) ...................................32

*Gross v. New York Times,*
    82 N.Y. 2d 146 (1993).........................................................46

*Hanna v. Plumer,*
    380 U.S. 460 (1965).............................................................18

*Herbert v. Lando,*
    441 U.S. 153 (1979)............................................................22

*Huggins v. Moore,*
    94 N.Y.2d 296 (1999) ....................................................31

*Immuno AG. v. Moor-Jankowski,*
    77 N.Y.2d 235 (1991) .......................................................49

*Intercon Sols., Inc. v. Basel Action Network,*
    791 F.3d 729 (7th Cir. 2015) ................................. 17, 24

iv

*International Shoppes, Inc. v. At the Airport, LLC*,
    131 A.D.3d 926 (2d Dept. 2015) .................................................................23

*James v. DeGrandis*,
    138 F. Supp. 2d 402 (W.D.N.Y. 2001)...........................................................48

*Klocke v. Watson*,
    936 F.3d 240 (5th Cir. 2019) ............................................................ 17, 20, 24

*Konikoff v. Prudential Ins. Co. of Am.*,
    234 F.3d 92 (2d Cir. 2000) ............................................................................42

*La Liberte v. Reid*,
    966 F.3d 79 (2d Cir. 2020) ......................................... 3, 17, 18, 19, 20, 21, 23

*Leiendecker v. Asian Women United of Minn.*,
    895 N.W.2d 623 (Minn. 2017) ......................................................................22

*Los Lobos Renewable Power, LLC v. Americulture, Inc*.
    885 F.3d 659, 668-73 (10th Cir. 2018), *cert. denied sub nom.*
    *AmeriCulture, Inc. v. Los Lobos Renewable Power, LLC*, 139 S.
    Ct. 591 (2018) ..............................................................................................17

*Masson v. New Yorker Magazine, Inc.*,
    510 U.S. 496 (1991)......................................................................................44

*McKee v. Cosby*,
    8674 F.3d 54 (1st Cir. 2017).........................................................................34

*Meloff v. New York Life Ins. Co*.,
    240 F.3d 138 (2d Cir. 2001) ................................................................... 43, 45

*Menaker v. C.D.*,
    No. 217CV5840DRHAYS, 2018 WL 5776533 (E.D.N.Y. Nov.
    1, 2018) .........................................................................................................48

*Nelson v. HSBC Bank USA* 87 A.D.3d 995, 998 (2d Dept. 2011)………………..26

*New York Times, Inc. v. Sullivan*,
    376 U.S. 254 (1964)......................................................................................23

*Palin v. New York Times Company*,
    940 F.3d 804 (2d Cir. 2019) ................................................................... 37, 42

v

*Palin v. The New York Times Company,*
  Civ. No. 17-cv-4853 (JSR), 2020 WL 7711593 (S.D.N.Y. Dec.
  29, 2020) ......................................................................... 4, 27, 28

*People v. Duggins*,
  192 A.D.3d 191 (3d Dept. 2021) ........................................... 25, 26

*Regina Metro. Co., LLC v New York State Div. of Hous. & Community
  Renewal,*
  35 N.Y.3d 332 (2020) .......................................................... 28, 29

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins.*,
  559 U.S. 393 (2010) ............................................................. 18, 19

*Spicer v. Pier Sixty LLC,*
  269 F.R.D. 321 (S.D.N.Y. 2010) ................................................. 24

*United Food & Com. Workers Union, Loc. 919, AFL-CIO v.
  CenterMark Prop's Meriden Square, Inc.*,
  30 F.3d 298 (2d Cir. 1994) ........................................................ 16

*United States ex rel. Newsham v. Lockheed Missiles & Space Co.*,
  190 F.3d 963 (9th Cir. 1999) ................................................. 17, 18

*Weiner v. Doubleday & Co.*,
  74 N.Y.2d 586 (1989) ............................................................... 31

*Westmoreland v. CBS Inc.*,
  596 F. Supp. 1170 (S.D.N.Y 1984) ............................................. 44

## **STATUTES**

28 U.S.C. § 1291 ......................................................................... 1

28 U.S.C. § 1332 ......................................................................... 1

L. 1992, c. 767, § 1 .................................................................... 26

NY Civ. Rights Law § 70-a ................................................. 2, 26, 27

NY Civ. Rights Law § 76-a .............................. 2, 19, 22, 26, 27, 30

NY CPLR 3211(1)(g) ....................................................... 2, 19, 26

vi

NY CPLR 3212(h) ................................................................. 2, 19, 20, 26

**<u>RULES</u>**

Fed. R. App. P. 4(a)(1)(A) .......................................................................1

## FRAP 28(a)(4) STATEMENT OF JURISDICTION

(A)    The district court had subject-matter jurisdiction under 28 U.S.C. § 1332 because there was (and is) complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

(B)    This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because the summary judgment that Coleman appeals was a final judgment disposing of all claims and parties.

(C)    The district court resolved a summary judgment motion and dismissed the amended complaint and amended answer with counterclaim on February 26, 2021; the Clerk entered the order implementing the decision on March 2, 2021. (JA.2557.)  Under Federal Rule of Appellate Procedure 4(a)(1)(A), Coleman timely filed a Notice of Appeal on March 26, 2021, fewer than 30 days after the district court's judgment became final. (JA.2558.)

(D)    The appeal is from a final order or judgment that disposes of all parties' claims, or information establishing the court of appeals' jurisdiction on some other basis.

## STATEMENT OF THE ISSUES

1.  Did the trial court err in applying the New York anti-SLAPP statute?

2.  Did the trial court err in dismissing Coleman's claim on summary judgment?

**2d Cir. LOCAL RULE 28.1(b) SUMMARY**

**1.      The Nature of the Case and Relevant Procedural History.**

**A.      Introduction.**

This case is about an opportunistic person named Maria Kim Grand ("Grand") who sought to establish herself as a jazz musician by actively pursuing relationship with an accomplished jazz musician named Steven Coleman ("Coleman)", entered into a sexual relationship with Coleman and fell in love with him. When the relationship ended, Grand cloaked her personal grievances in the guise of sexual harassment and the broader societal "Me Too" movement. Not content with moving on from what was a difficult but consensual relationship, Grand published defamatory statements about Coleman to a few select persons to get their feedback on her planned letter, which she then published to a broader but still finite group. Grand's hand-picked editors included persons that knew Coleman. Importantly, although Grand used the more general term of "sexual harassment," she also accused Coleman of forced sexual relations with her by threatening to withhold professional favors. As a result, Coleman suffered significant damages to his business and reputation.

This case raises important novel questions as to the impact of the New York anti-SLAPP law (found in four separate statutory provisions, NY Civ. Rights Law §§ 70-a, 76-a, NY CPLR 3211(1)(g), and NY CPLR 3212(h)) (the "NY Statute") on

2

New York's common law of defamation. If the district court's rulings are affirmed, which contravene this Court's prior holdings in *La Liberte v. Reid*, 966 F.3d 79, 87 (2d Cir. 2020), then virtually every defamatory utterance that can be linked to a prevailing social movement will require a heightened standard of proof and implicate other aspects of law not presently found in defamation cases. In other words, affirming the district court's opinion will effectively eviscerate defamation law and we know it. This Court struck the balance between freedom of speech and protection from unlawful speech in *La Liberte.* The district court's ruling, if sustained, would undo *La Liberte* and place this Court squarely in the minority viewpoint regarding the applicability of anti-SLAPP statutes in federal court, which this Court has already rejected.

### B.  Procedural history.

Coleman filed the complaint on October 10, 2018. (JA.17-42.) Coleman amended his complaint on March 8, 2019. (JA.73-84.) Grand filed her answer and counterclaims (which are not at issue in this appeal) and amendments thereto. (JA.45, 92.) Coleman filed a motion for summary judgment on October 24, 2019. (JA.133.) Grand filed her opposition to Coleman's summary judgment motion and a cross-motion for summary judgment. (JA.1407, 2177.) Coleman and Grand filed their respective replies on December 19, 2019, closing the briefing. (JA.2454, 2477.)

CLARKHILL\K3597\421993\263402005.v5-7/6/21

Importantly, over a year after briefing was closed, on February 2, 2021, Grand filed a notice of "new" authority, announcing that on November 10, 2020 (almost a year after briefing was closed) New York amended its anti-SLAPP statute. (JA.2510-25.) That notice of authority briefly referenced the statute, and made the assertion that the amendment was retroactive, citing the December 29, 2020 unpublished decision in *Palin v. The New York Times Company*, Civ. No. 17-cv-4853 (JSR) 2020 WL 7711593 (S.D.N.Y. Dec. 29, 2020), which addressed the impact of the amendments. (*Id*.) On February 3, 2020, per a docket notation the hearing was adjourned to February 20, 2020. On February 12, 2020, Judge Weinstein was recused, and Judge Vitaliano was assigned, and "all previously scheduled proceedings" were cancelled. (JA.2508.) Grand filed the notice of new authority on February 2, 2021. (JA.2510-25.) Two weeks later, with nothing further from the Court, the memorandum and order of decision dated February 26, 2021 was entered. (JA.2526-56.)

Notably, the "notice of new authority" that was not submitted until February 2, 2021 referenced that on *November 10, 2020*, the New York legislature amended its anti-SLAPP law. (JA.2510.) No explanation was offered by Grand as to why notice of this was not brought to the Court's attention until three months later. Grand argued that the amendments to the statute were retroactive, based on an unreported decision issued December 29, 2020 and attached to the notice. (JA.2510-11.) *At no time were*

4

*Coleman or the parties directed to brief the issue, which was raised over a year after the close of briefing on summary judgment.*

### 2. Judge who rendered the decision.

Hon. Eric N. Vitaliano, U.S.D.J.

### 3. The disposition below.

The district court granted in part and denied in part both motions by dismissing all claims in the case. (JA.2526-57.) In its February 26, 2021 Memorandum and Order, the district court ordered that "both parties' defamation claims and Grand's IIED [intentional interference with emotional distress] counterclaim fail as a matter of law, and the respective cross-motions [for summary judgment] are resolved correspondingly." (JA.2526-56.) The Clerk of Court was "directed to enter judgment accordingly and to close this case." (JA.2556.)

On March 2, 2021, the Clerk entered summary judgment in favor of Grand on Coleman's libel claim (this is the only ruling at issue in this appeal); granting summary judgment in favor of Coleman on Grand's defamation counterclaims; and granting summary judgment in favor of Coleman on Grand's intentional infliction of emotional distress claim; and judgment was entered accordingly. (JA.2557.)

**4.      Cite to decision or supporting opinion, if reported.**

*Coleman v. Grand*, -- F. Supp. 3d --, No. 18CV5663ENVRLM, 2021 WL 768167 (E.D.N.Y. Feb. 26, 2021)**.**

## CONCISE STATEMENT OF THE CASE

The parties met in 2009 when Grand solicited Coleman's help in establishing herself in the world of American jazz. (JA.94 at ¶ 10.) They were in a sexual relationship from 2011 through 2016. (JA.228:2, 249:21-25, 250:1-3, 849:14-18.) Following that termination, in 2017 Grand made separate defamatory statements in a series of publications to various finite groups of individuals.

Between November 5 and November 8, 2017, Grand sent draft versions of the letter to select persons for comment specifically identifying and defaming Coleman by expressly referring to "my experience *with sexual harassment* and with Steve Coleman." (JA.1313, 1316, 1329, 1331-48 (emphasis added).) Multiple November 6 emails specifically reference the November 5 email and Grand's reference to sexual harassment and Steve Coleman. (JA.1313, 1316.) Whether in the email or the draft letter, each person was made aware of the defamatory statement that Coleman had sexually harassed Grand.

From November 5 to November 7 Grand continued emailing three of the recipients about the draft letter, seeking feedback (JA.1331-34, 1342-48.) Between November 7 and 8 Grand exchanged emails regarding her draft letter with two more

6

individuals. (JA.1336-39.) The defamatory statements about Coleman and his alleged sexual harassment were therefore published to a finite audience about Grand's personal and intimate relationship, preparatory to sending a letter to a broader group, and indicate that Grand was repeatedly publishing her defamatory statements to a selected "echo chamber" to help her craft her final letter.

On November 14, 2017 and thereafter, Grand sent an email and the finalized letter ("the Letter") to approximately forty-three persons. (JA.176-84, 263-75, 498-507, 1223-25.) The Letter specifically referenced "sexual harassment." (JA.170, 501.) Although the Letter did not mention Coleman by name, there is no factual dispute that he was the subject and those to whom Grand made the publication knew who it referred to. (RoA.389-391; JA. 491-92, 499, 508-16, 614.)

On November 27, 2017, Grand re-published her Letter and identified Plaintiff as the subject thereof to Sara Serpa, Sella, Okkyung Lee, Jen Shyu, Fay Victor, Nicole Mitchell, and Imani Uzuri. (JA.1281-91.) Grand authorized Okkyung Lee to disseminate the Letter to others, and to identify Coleman as the subject. (JA.1292-1311.)

Notwithstanding that Grand contacted multiple reporters with the Letter, the record does not reveal any story in the United States prior to the filing of Coleman's complaint. (JA.379-80.) Grand admitted on deposition that she decided to send her letter "only to some people and not post it on Facebook or send it to a newspaper."

7

(JA.270:5-7, 412.) In the November 14, 2017 email Grand herself instructed that the Letter should not be publicly disseminated. (JA.176.) The contradiction in what she said at her deposition and what she actually did present an important factual issue that goes to her credibility as to whether she knew she was making false charges or not, which was not addressed by the district court.

As for the defamatory statements, the core statements are found in the Letter. The Letter contains the following express references to sexual harassment as well as claims that sexual relations were forced upon her in exchange for professional benefit:

1.    "In September 2013 he broke up with me…. By that point, though, I wasn't in love with him anymore. I didn't want to be intimate with him anymore. *That period is when the sexual harassment started*." (JA.503-04. (emphasis added).)[1]

2.    "*I was sexually harassed inside of a professional relationship*." (JA.501) (emphasis added).)

3.    "Whenever he offered me more work, he would wait until I actually slept with him to solidify the dates." (JA.504.)

---

[1] Grand's Letter appears multiple times throughout the record, for consistent referencing, this brief will cite to the copy of the Letter used at Grand's deposition and attached to Coleman's summary judgment motion. (JA.1098-1105.)

4.   "On tour I would have to sleep with him at the end of the day lest him be absolutely angry and sometimes refuse to rehearse the band the next day." (JA. 504.)

5.   "As long as I kept having sex with him, he would teach me. I figured at that time that this was the only way I was going to be able to learn. I practiced like crazy. I was learning a whole bunch and I had no money, so there would've been no way for me to pay him for all these lessons." (JA.503.)

6.   "Indeed when I stopped agreeing to sleep with him he stopped granting me access to his knowledge, and he made my professional life with him a complete nightmare." (JA.503.)

7.   "I remember after one concert we played, I came to the hotel room (he made us share hotel rooms) but refused to have sex with him. He told me I was not going to go to sleep without having sex with him." (JA.503.)

8.   "But when it was time to sleep, 'X' started getting angry and doing his emotional withdrawal thing where he stopped talking to me. I ignored him and I went to sleep. In the middle of the night, I woke up. He was half-naked, kissing me on the lips. I pushed him away. After some protesting on my end he finally left, went back to his bed. and didn't bother me again for the rest of the night." (JA.505.)

On the same day, November 14, 2017, Grand sent the same letter but pasted into an email to Douglas Hammond, in which she specifically identifies Coleman

9

("Steve") in the email in terms of the reference to sexual harassment. (JA.509.) This was a separate publication of the Letter in the body of the email. (*Id.*)

On November 16 Grand further discussed the Letter with Steve Rowland and made the following additional statements accusing Coleman of abuse and harassment:

> Anyways, after I started resisting his advances, it was only *harassment and coercion*. I want to stress that again. After September 2013, all I was is harassed. It's a long time to be harassed. I made it clear many times that I wanted him to stop propositioning me, and he didn't care. I'm highly annoyed that this was not more clear in my letter and that you felt the need to stress that relationships should be kept out of work. This isn't about relationships. It's about *abuse and harassment*…

(JA.2097-2102.) (emphases added)

Having repeatedly and separately published allegations of sexual harassment, coercion and abuse, the record is replete with Grand's factual admissions that contradict those claims and could lead a jury to conclude the above statements as to sexual harassment or forced sex were part of a deliberate plan to use Coleman. Critically, *Grand admitted that Coleman never forced Grand to have sex:*

> Q. Do you allege at any time between June of 2011 and September of 2016 that Mr. Coleman forced you to have sex?
> A. I was not forced physically.

(JA.250-51.)

Additional facts in the record also provide sufficient evidence for a jury to consider that all the statements of "sexual harassment" and "abusive" or "coercive"

conduct were known to be untrue, given that Grand stated expressly in an email dated June 12, 2011, to her then boyfriend "*I want to experiment [sic] something with Steve.*" (JA.473-74 (emphasis added).) On July 4, 2011, Grand offered Coleman sexual favors in exchange for the opportunity to travel to Chicago with him. (JA.335-38, 551, 1256.) On or about July 7, 2011, in a chat with Antoine Roney, Grand stated that "*I manipulated somebody to get what I wanted,*" identified what she wanted as "musical knowledge," stated that "...[I] used by body to get musical knowledge," and then identified Coleman as the person she manipulated. (JA.354-55, 554-75. (emphasis added).) On September 27, 2011, Grand stated in an email to Coleman that "It's funny because I feel melancholic now that I told you I don't wanna have sex anymore. Actually, I've always wanted some kind of intimacy with you, even though I like to think that you got me into it.  As you know, *I'm also a calculative person*, and I've pulled you back many times–just in order to obtain what I wanted;" that "I learnt [sic] I by being close to you;" and that "*I would like you to teach me like you do, but in a barter situation, where I do things for you and you do things for me*." (JA.338-39, 552, 1254 (emphases added).) Grand further admitted in a February 14, 2012 message that Coleman "fell in a trap." (JA.229:6-7.)

Despite claims in the Letter that she was being sexually harassed after 2013, in the months following their breakup in September of 2013, Grand called, emailed, and texted Coleman often. (JA.304-07.) In October 2013, *Grand attempted to entice*

11

*Coleman into a threesome with a random woman*. (JA.144; (emphasis added); RoA.306-67.) On November 1, 2013, Grand sent Coleman an angry email berating him for not caring about her enough or talking to her enough. (JA.327.) On December 24, 2013, Grand wrote to Coleman "I would love to be married to you, but unfortunately I am sure it will not happen," and "I am in love with you, it just is what it is." (JA.117 at ¶ 20; RoA.457-458.) On or about September 11, 2014, Grand wrote to Coleman: *"Your tongue still works. That's all I need anyways."* (JA.118 at ¶ 24 (emphasis added); RoA.493-495.)

All of this is the background against which the claims in the Letter must be viewed in terms of evaluating Grand's state of mind.

The Letter stated that "[h]e would call me in the middle of the night and *never take no for an answer*." (JA.500-07 (emphasis added).) However, during her deposition, Grand could not identify a time when Coleman initiated intimacy and refused to take "no" for an answer. (JA.318 et seq.), a flat contradiction of this statement of physical sexual harassment.

Further, in his expert report, Dr. Robert Gordon writes "Learning of Mr. Coleman sexual rituals precludes the possibility of coercion since it requires consent and a long period of cooperation before physical intimacy." (JA.1102.) The district court did not refer to this at all, and only referenced Coleman's expert report once for a calculation of damages. (*See* JA.2531.)

12

## <u>SUMMARY OF ARGUMENT</u>

The district court should not have applied the NY Statute and its particular actual malice and enhanced procedural standards because the Statute, as the majority of Circuits have said about its rejected versions in other states, unconstitutionally interferes with the federal rules (particularly Rule 56), among other Constitutional infirmities. The district court also should have offered Coleman the opportunity to brief this late-raised point.

But even if the NY Statute were applicable here, the district court erred in applying it retroactively in contravention of New York law. Moreover, even if the district court did properly apply the NY Statute retroactively, this case does not fall under it because this case is a matter of private concern and not public interest. Having erroneously determined that that actual malice standard applied, the district court further erred by incorrectly applying that standard, and by ignoring contradictory and disputed facts that could have led a reasonable juror to find that Grand subjectively knew what she said about Coleman was false. Finally, district court erroneously found that Grand's statements were matters of opinion and it erroneously ignored applicable New York precedent that claims of sexual harassment are actionable, whether or not the malice standard applies.

13

## STANDARD OF REVIEW

The Second Circuit reviews questions of law under a de novo standard of review. *US v. L-3 Commc'ns EOTech, Inc.*, 921 F.3d 11, 18 (2d Cir. 2019). When reviewing under a de novo standard, the Second Circuit reviews the issues under the same standards employed by the district court. *Wholean v. CSEA SEIU Local 2001*, 955 F.3d 332, 334 (2d Cir. 2020). A grant of summary judgment "is reviewed de novo" and "[a]ll legal conclusions by a district court are reviewed de novo." *Spak v. Phillips*, 857 F.3d 458, 461 (2d Cir. 2017).

The Second Circuit reviews findings of fact for clear error. *L-3 Commc'ns EOTech, Inc.*, 921 F.3d at 18. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. The Court has repeatedly used this formulation." *Wu Lin v. Lynch*, 813 F.3d 122, 126 (2d Cir. 2016) (citation and quotation omitted).

A mixed question of law and fact exists where particular facts are applied to a legal principle. *Isett v. Aetna Life Ins. Co.*, 947 F.3d 122, 129-30 (2d Cir. 2020). While the district court's findings of fact are reviewed for clear error and conclusions of law are reviewed de novo, "[m]ixed questions of law and fact are reviewed de novo." *Man Ferrostaal, Inc. v. M/V Akili*, 704 F.3d 77, 82 (2d Cir. 2012). The Second Circuit reviews "the district court's conclusions of law, and its application of

14

the law to the facts, de novo. [M]ixed questions of law and fact are reviewed either de novo or under the clearly erroneous standard[,] depending on whether the question is predominantly legal or [predominantly] factual." *Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 95 (2d Cir. 2012) (citations and quotations omitted).

## **ARGUMENT**

**I.     The district court erred by applying the NY Statute.**

**A.     The district court never gave Coleman an opportunity to brief the NY Statute's applicability.**

But for the NY Statute's application here, Coleman would have had to show only that Grand was negligent (not malicious) in her Letter's defamatory statements. With application of the NY Statute based on a claim of public interest, that standard changed. The district court, however, never gave Coleman a chance to argue the lower burden of proof. This error greatly prejudiced Coleman, since the decision turned on it in large part. This was particularly important since the district court had already rejected a malice standard when it rejected Grand's arguments that Coleman was a public figure. The district court wrote that the NY Statute "has imposed a new standard for matters of public concern that requires Coleman to show how she [Grand] acted with actual malice;" rather than the "grossly irresponsible manner" standard under New York common law, which the district court did not further address. (JA.2538.)

As the district court itself noted, Grand first asked the district court to apply the NY Statute in a notice of additional authority that she filed over a year after the summary judgment briefing had closed. Grand's notice advocated for the NY Statute's *retroactive application* based on *one unpublished* decision, with no mention how other circuits have addressed this issue or that the majority circuits have rejected the application of Anti-SLAPP laws in federal court. (JA.2510-11.) Without briefing from Coleman on this critical issue, the district court approved of Grand's argument. Considering that Grand's thin argument advocated the NY Statute's *retroactive application* based on *one unpublished* decision and was the the district court's only justification for imposing the actual malice standard, its error is even more pronounced. (JA.2510-25.)

This Court prefers to address only issues that have been fully briefed below. As the Court explained in *United Food & Com. Workers Union, Loc. 919, AFL-CIO v. CenterMark Prop's Meriden Square, Inc.*, 30 F.3d 298, 306-07 (2d Cir. 1994) (internal quotations omitted), "our preferred practice . . . is to remand the issue for consideration by the district court in the first instance where, as here, such a theory has been briefed and argued only cursorily." The decision on appeal rests on a disfavored, unbalanced, cursory presentation about the NY Statute's consequential applicability. The Court should vacate and remand so that Coleman can have a fair opportunity to address this issue before the district court.

16

**B.** **The district court's application of the NY Statute conflicts with the Federal Rules and violates the Seventh and Fourteenth Amendments.**

    **1.** **The NY Statute cannot be constitutionally applied under the *Erie Doctrine.***

Until now, this Court has not been asked to decide the constitutionality of the NY Statute's application in federal court. Last year, however, this Court joined the majority of other circuit courts that have refused to apply various other state anti-SLAPP laws in federal court, particularly in the context of pretrial dismissal under Rules 12 and 56.[2] *See La Liberte*, 966 F.3d at 87 (rejecting minority applications of anti-SLAPP laws in *Godin v. Schencks*, 629 F.3d 79 (1st Cir. 2010) (Maine) and *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963 (9th Cir. 1999) (California)).[3] In joining the majority view, this Court also considered

---

[2] Other than citing in passing *La Liberte* for the proposition that California's anti-SLAPP statute is "procedural," the district court ignored this decision.

[3] *See Klocke v. Watson*, 936 F.3d 240, 242-46 (5th Cir. 2019) (rejecting Texas' anti-SLAPP statute); *Carbone v. Cable News Network, Inc.*, 910 F.3d 1345, 1347-54 (11th Cir. 2018) (rejecting Georgia's statute); *Los Lobos Renewable Power, LLC v. Americulture, Inc*. *See* 885 F.3d 659, 668-73 (10th Cir. 2018), *cert. denied sub nom. AmeriCulture, Inc. v. Los Lobos Renewable Power, LLC*, 139 S. Ct. 591 (2018) (rejecting New Mexico's statute); *Intercon Sols., Inc. v. Basel Action Network*,791 F.3d 729, 729-32 (7th Cir. 2015) (rejecting Washington's statute); *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1333-34 (D.C. Cir. 2015) (rejecting D.C.'s statute). For minority decisions that have approved of anti-SLAPP statute application in federal court *see Godin,* 629 F.3d at89 (1st Cir.) (applying Maine's anti-SLAPP statute); *Newsham*, 190 F.3d at 972 (9th Cir. applying California's anti-SLAPP statute).

17

and rejected the minority view of the two Circuits to address the issue.[4] This Court rejected the argument that the Maine anti-SLAPP standard supplements rather than conflicts with the Federal Rules, "because the more permissive standards of the Federal Rules likewise reflect policy judgments as to what is sufficient" and that the California anti-SLAPP statute "can[not] exist side by side . . . without conflict." *La Liberte*, 966 F.3d at 87-88.

The rationale, accepted by this Court in *La Liberte*, for the majority view that state anti-SLAPP statutes do not apply in federal court, is that unlike substantive state laws, state procedural laws do not apply in federal court. *See Erie R.R. v. Tompkins*, 304 U.S. 64 (1938); *Hanna v. Plumer*, 380 U.S. 460, 470 (1965) ("the *Erie* rule has never been invoked to void a Federal Rule."). Anti-SLAPP laws can only apply in federal court if they are (1) substantive; and (2) do not conflict with federal law. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins.*, 559 U.S. 393, 398-401 (2010) (plurality) (clarifying rule in class action context and holding that a New York statute which "imposes additional requirements" on Federal Rule 23 did not apply in federal court); *La Liberte*, 966 F.3d at 87.

The Supreme Court in *Shady Grove* made clear that New York's class action statute held that New York's state class action statute would not apply in diversity

---

[4] *See Godin v. Schencks*, 629 F.3d 79 (1st Cir. 2010) (applying Maine's statute); *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963 (9th Cir. 1999) (applying California's statute).

18

suits since the federal rule was not "ultra vires." Federal Rule 23 "permits all class actions that meet its requirements, and a State cannot limit that permission by structuring one part of this statute to track Rule 23 and enacting another part that imposes additional requirements." 559 U.S. at 401. Under *Shady Grove's* two-part analysis, the court looks at (1) whether the state and federal rules address the same issue and (2) whether the federal rule is within its statutory authorization. *Id.* at 398. In this case, both criteria are met and the application of the NY Statute fails.

Applying *Shady Grove*, this Court agreed that state and federal rules conflict if "a Federal Rule of Civil Procedure 'answer[s] the same question' as the [state law]." *La Liberte*, 966 F.3d at 86. Consequently, the existence of a conflict turns on whether the state law "answers the same question as Federal Rules 12 and 56." *Id*. Here, because the NY Statute is procedural and it conflicts with federal law, the district court erred when it applied the NY Statute to Coleman's defamation claim because it impermissibly conflicts with Federal Rule 56.

The relevant and intertwined portions of the NY Statute are procedural, not substantive, because they neither create nor alter any substantive rights under the New York or Federal Constitutions. *See* NY Civ. Rights Law §§ 76-a(3); CPLR 3211(1)(g); CPLR 3212(h); *see also Carbone v. Cable News Network, Inc.*, 910 F.3d 1345, 1355 (11th Cir. 2018) (noting Georgia statute is procedural as it "creates no substantive rights"). As the Fifth Circuit said of Texas's anti-SLAPP statute, it "deals

19

only with the conduct of the lawsuit; it creates no rights independent of existing litigation." *Klocke v. Watson*, 936 F.3d 240, 247 (5th Cir. 2019); *see also Carbone*, 910 F.3d at 1355 (holding that Georgia anti-SLAPP statute does not "alter a defendant's rights to petition and freedom of speech" it simply "make[s] it easier for a defendant to avoid liability for conduct associated with the exercise of those rights by providing a special procedural device . . . that applies a heightened burden to the claims that fall within its ambit.").

The NY Statute sets forth procedural requirements that conflict with Federal Rules 12 and 56 by addressing "the same question" that they do. *La Liberte*, 966 F.3d at 86; *see also Klocke*, 936 F.3d at 245 (explaining that state and federal laws conflict "when each specifies requirements for a case to proceed at the same stage of litigation."). This conflict is worsened by how the NY Statute makes it harder to successfully challenge existing rights, like free speech, through its erection of barriers, like heightened burdens of proof.

Specifically, the NY Statute requires that a summary judgment motion be granted "unless the party responding to the motion demonstrates that the action, claim, cross claim or counterclaim has a substantial basis in fact and law or is supported by a substantial argument for an extension, modification or reversal of existing law." NY CPLR 3212(h). Although *La Liberte* decided a motion to dismiss

under Rule 12, this Court nonetheless noted the relevant state statute's interference

with Rule 56 in language applicable here::

> It also conflicts with Rule 56, which permits summary judgment only
> if "the movant shows that there is no genuine dispute as to any material
> fact and the movant is entitled to judgment as a matter of law." Fed. R.
> Civ. P. 56(a). The Rule thus enables plaintiffs to proceed to trial by
> identifying any genuine dispute of material fact, whereas California's
> anti-SLAPP statute "nullif[ies] that entitlement by requiring the
> plaintiff to prove that it is likely, and not merely possible, that a
> reasonable jury would find in his favor."

*La Liberte*, 966 F.3d at 87.

Like the California statute whose application this Court rejected in *La Liberte*,

the NY Statute also imposes a more demanding showing on summary judgment

movants by requiring them to demonstrate the claim has "a substantial basis in fact

and law or is supported by a substantial argument for an extension, modification or

reversal of existing law." This standard conflicts with Rule 56 by requiring a plaintiff

to make an evidentiary showing of facts supporting his claim and to demonstrate that

the defendant cannot defend against it. *See Edwards v. Martin*, 158 A.D.3d 1044,

1048 (3d Dept. 2018).

The amendments to the NY Statute have now applied the anti-SLAPP

summary judgment standards to this case by virtue of the 2020 amendments. In so

doing, they have essentially conformed the NY Statute to the California statute that

this Court previously rejected for the policy and Constitutional reasons established

under *Erie, Hanna,* and *Shady Grove.* The majority of Circuits agree. This Court

21

should re-apply its own reasoning and prior holding to the NY Statute, and reverse the district court's application of the NY Statute here as a matter of law.

### 2. The NY Statute's application interferes with the Seventh Amendment right to trial by jury.

The NY Statute's heightened standards and burdens also puts it at odds with the Constitutional right to trial by jury under the Seventh Amendment. By requiring district courts to weigh competing facts and inferences on summary judgment, the NY Statute eliminates a plaintiff's constitutional right to a jury trial on disputed issues of material fact. *See* NY Civ. Rights Law § 76-a(2); *cf. Leiendecker v. Asian Women United of Minn.*, 895 N.W.2d 623, 634-37 (Minn. 2017) (holding that Minnesota's anti-SLAPP statute violated the state's constitutional right of trial by jury); *Davis v. Cox*, 351 P.3d 862, 183 Wash.2d 269, 295-96 (Wash. 2015) (same for Washington's anti-SLAPP statute). The NY Statute should not apply for this reason.

### 3. The NY Statute's application interferes with the Fourteenth Amendment.

The NY Statute also violates the Equal Protection Clause of the Fourteenth Amendment because it lacks a rational basis for granting extra protection to victims of defamation. The Supreme Court has "declined in other contexts to grant special procedural protections to defendants in libel and defamation actions" because "the potential chill on protected First Amendment activity stemming from libel and

defamation actions is already taken into account in the constitutional limitations on the substantive law governing such suits." *Calder v. Jones*, 465 U.S. 783, 790-91 (1984), citing *New York Times, Inc. v. Sullivan*, 376 U.S. 254 (1964); *Gertz*, 418 U.S. 323 (1974), *Herbert v. Lando*, 441 U.S. 153 (1979). But there is more.

New York courts have themselves found that the NY Statute imposes a "heavy burden" on a plaintiff opposing an anti-SLAPP motion. *See 161 Ludlow Food, LLC v. L.E.S. Dwellers, Inc*., 107 N.Y.S.3d 618, at *4 (N.Y. Sup. Ct. Apr. 23, 2018) (Slip Copy), *aff'd*,176 A.D.3d 434 (1st Dept. 2019); *International Shoppes, Inc. v. At the Airport, LLC*, 131 A.D.3d 926, 928-29 (2d Dept. 2015) (recognizing citizen's rights, court nonetheless found "plaintiffs sustained their statutory burdens."). In *International Shoppes,* it was also recognized that the NY Statute imposes "a heightened standard of proof to avoid dismissal of the action" and that "these procedural protections serve to make it easier for defendants to test their adversaries' proof at an earlier stage of the litigation." *Id.* at 930-31, 939 (Miller, J. concurring in part and dissenting in part) (internal citations and quotations omitted). Faced with statutes like the NY Statute, this Court and others have rejected such laws for coming into conflict with federal law. *See La Liberte*, 966 F.3d at 87 (holding that California anti-SLAPP statute conflicted with Rule 56 by requiring a plaintiff to prove it is

likely, and not merely possible, that a reasonable jury would find in his favor).[5]

Procedural as it is, and saddling plaintiffs with a different and heavier burden than they face under Rule 56, the NY Statute should not have been applied to Coleman below.

## II. Even if the NY Statute were held to apply despite this Court's *La Liberte* decision, then it was error to give it retroactive effect.

If the NY Statute is procedural, then it is inapplicable as conflicting with the federal rules discussed above. However, if the Statute is substantive, then it is a matter of state law under *Erie* and this Court's determination of whether to apply a state's substantive law retroactively is controlled by that state's law. See *Am. Trucking Assn's v. Smith*, 496 U.S. 167, 177 (1990) ("When questions of state law are at issue, state courts generally have the authority to determine the retroactivity of their own decisions."); *Spicer v. Pier Sixty LLC,* 269 F.R.D. 321, 329 (S.D.N.Y.

---

[5] *See Klocke*, 936 F.3d at 245-46 (holding that Texas anti-SLAPP statute conflicted with Rule 56 by requiring courts to determine by preponderant evidence if the action relates to First Amendment rights and if each element of a plaintiff's claim is supported by clear and specific evidence); *Carbone*, 910 F.3d at 1350-51 (same for Georgia's anti-SLAPP statute because it nullified its entitlement to proceed to trial upon showing a genuine issue of material fact "by requiring the plaintiff to prove that it is likely, and not merely possible, that a reasonable jury would find in his favor"); *Intercon Sols., Inc.,*791 F.3d at 732 (same for Washington's anti-SLAPP statute because its requirement that judges "resolve factual disputes on a paper record violates the right to trial by jury"); *Abbas,* 783 F.3d at 1333 (same for District of Columbia's anti-SLAPP statute, which required dismissal when the court found no "likelihood of success on the merits.").

2010) ("Retroactivity is a question of New York state law."). The district court itself applied New York law. (JA.2540.)

New York law strongly disfavors its laws' retroactive application. As the court explained in *People v. Duggins*, this "deeply rooted presumption against retroactivity is based on elementary considerations of fairness that dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly." 192 A.D.3d 191, 191 (3d Dept. 2021). As if speaking about this case, the court added in *Duggins* that retroactive application of New York's substantive laws should be checked because "responsivity to political pressures poses a risk that [the Legislature] may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals." *Id.* at 191 (internal citations and quotations omitted). That concern is palpable here.

New York statutes are "presumed to have prospective application" unless (1) "the Legislature's preference for retroactivity is explicitly stated or clearly indicated;" or (2) the statute is either "remedial" or it governs "procedural matters" that do not "impair vested rights or bestow additional rights." *Id.* at 191 (internal citations and quotations omitted). "Other factors to consider include whether the Legislature has made a specific pronouncement about retroactive effect or conveyed a sense of urgency; whether the statute was designed to rewrite an unintended judicial interpretation; and whether the enactment itself reaffirms a legislative

25

judgment about what the law in question should be." *Nelson v. HSBC Bank USA* 87 A.D.3d 995, 998 (2d Dept. 2011) (internal citations and quotations omitted). "[C]ourts must attempt to discern the Legislature's intent, first by looking to the language of the statute and, if necessary, considering legislative history and other guides." *Duggins*, 192 A.D.3d at 191 (internal citations and quotations omitted). None of these retroactivity criteria are satisfied here.

The district court applied the NY Statute to Coleman retroactively. Indeed, Grand could not have relied on it otherwise. The Statute's two pre-2020 versions (1992 and 2008), which protected speech against projects that require public-agency approval, did not apply to Coleman's defamation claim about Grand's 2017 Letter. *See* L. 1992, c. 767, § 1; NY Civ. Rights Law §§ 70-a, 76-a (2008); NY CPLR 3211(1)(g); NY CPLR 3212(h). In 2020, the New York legislature amended the NY Statute to extend it to any action concerning public communication (i.e. any non "purely private matter") about an issue of public interest, they required courts to consider anti-SLAPP motions and stay proceedings while they do so, and they mandated attorney fee shifting. *See* NY Civ. Rights Law §§ 70-a, 76-a (2020); NY CPLR 3211(1)(g)(2) and (3); 3212(h) (2020). In so doing, the amendments now applied the anti-SLAPP summary judgment standards in NY CPLR 3211(h) to this case, after the events had occurred and after the case had commenced, and after discovery was closed.

26

Grand's actions further demonstrate that the NY Statute's pre-2020 version could not apply here. Although Coleman filed his action in 2018, Grand waited until after the NY Statute's November 2020 amendments passed before she asked the district court to retroactively apply the Statute to Coleman's claim about Grand's 2017 Letter. (*See* JA.17, 2510-11.) The district court did so without hearing from Coleman. (JA.2526-56.) This was reversible, prejudicial error.

Importantly, the NY Statute contains no "expressly stated or clearly indicated" legislative intention to apply it retroactively. On the contrary, by their express terms the amendments took effect immediately upon signing and the New York Legislature made no express statement that the Statute should apply retroactively. *See* NY Civ. Rights Law §§ 70-a, 76-a. Regardless of whether the NY Statute could be considered remedial, it must also be either substantive or procedural. If the NY Statute did only govern "procedural matters," then it should not have been applied due to its conflict with federal law. *See* Section I *supra*. And if the NY Statute is substantive, it cannot be applied retroactively.

None of this is changed by *Palin v. The New York Times Co.*—the only case that the district court mentioned in support of its retroactive application of the NY Statute. (JA.2539-41 (citing Civ. No. 17-cv-4853 (JSR), 2020 WL 7711593 (S.D.N.Y. Dec. 29, 2020)).) To the extent this Court considers *Palin,* the court there did not point to any express language in the statute that made it retroactive; to the

27

contrary, the court assumed the Legislature had a "sense of urgency" by making the act "take effect immediately." *Palin*, 2020 WL 7711593, *3-4 (citing A.B. 5991-A § 4; additional citation omitted). If the Legislature had wanted to make the statue retroactive, it could and should have done so expressly. Moreover, the decision in *Palin* rejected application of the NY Court of Appeals decision in *Regina Metro. Co., LLC v. New York State Div. of Hous. & Community Renewal*, 35 N.Y.3d 332 (2020) because no hardship was shown from a due process standpoint. *See Palin*, 2020 WL 7711593, *3-4. Coleman was not given the opportunity to address this below, and the hardship results from this arbitrary application of a heightened standard after discovery. In that regard, the retroactive application of the NY Statute imposed the actual malice standard on Coleman, when the district court had already rejected other malice standards in its general or limited public figure analysis. The malice standard under the NY Statute was admittedly different from the standards under common law and *Chapadeau v. Utica Observer-Dispatch*, 38 N.Y.2d 196 (1975), as acknowledged and articulated by the district court (JA.3217.) and noted above.

The district court's retroactive application of the NY Statute and its heightened burdens and malice standard is manifestly unfair. Coleman did not commence his action with the NY Statute in mind. If he had, he would have pled his action differently. Had the 2020 version of the NY Statute been in effect when

28

Coleman brought his action, it would have shaped not only his pleading but Grand's answer and her counterclaim as well. This would have enabled these issues to be raised and resolved at the motion to dismiss stage. Had it been the operative standard at the summary judgment stage, the entire argument and factual presentation would have been different. Had Coleman known that the malice requirement applied, he (and likely Grand as well) would have conduced discovery accordingly. The standard under the NY Statute is not the same type of malice or heightened standard that was briefed below regarding general or limited public figures, or even the New York common law standard for matters of public concern. It is sufficiently different so that Coleman was prejudiced by not being able to conduct discovery under the anti-SLAPP standards were it to have applied.

Consequently, even if the NY Statute were deemed substantive, its retroactive application here is fundamentally unfair. After years of discovery and expert witness opinion, Coleman not only learned that the "rules of this game" changed, they changed after the "game" already ended without ever giving him an opportunity to adjust his "play" to the new rules. *See Regina Metro. Co., LLC*, 35 N.Y.3d at 387-88 ("[A]n unfair retroactive assessment of liability upsets settled expectations, and it thereby undermines a basic objective of law itself. To find that the Due Process Clause protects against this kind of fundamental unfairness—that it protects against an unfair allocation of public burdens through this kind of specially arbitrary

29

retroactive means—is to read the Clause in light of a basic purpose: the fair application of law. . ." (internal quotations omitted)); *see also Eastern Enter's v. Apfel*, 524 U.S. 498, 556-57 (1998) (Bryer, J. dissenting) ("the Due Process Clause can offer protection against legislation that is unfairly retroactive . . . [for example] . . . a law that is fundamentally unfair because of its retroactivity is a law that is basically arbitrary."). The district court erred by applying the NY Statute here.

## III. The district court erred in finding that Grand addressed a matter of public interest in her limited distribution of her Email and her Letter.

The NY Statute defines "public interest" as anything other than a 'purely private matter.'" NY Civ. Rights Law § 76-a. "Purely private matter" is not defined in the Statute. With no analysis, the district court ruled that Grand's comments about Coleman were a matter of public interest that implicated the NY Statute and its heightened requirement that Coleman prove Grand acted with the heightened and new standard of actual malice. (JA.2538-45.). This was error.

Grand put her emails and Letter in limited circulation as she only sent it to a small, selected group of those known to Coleman. (*See* JA.1313, 1316, 1329, 1331-34.) Grand herself restricted public circulation. (*Id*.) She sent her Letter to approximately 43 people. (*See* JA.263-75, 1223-25.) Importantly, Grand distinguished her limited communications about Coleman from their possible future public exposure when she stated in November 14, 2017, that "this *might end up being public at some point,* but I have do make sure it's done in an effective way and I

30

protect myself." (JA.34 (emphasis added).) Grand instructed "please don't forward the actual letter to anyone," and she later controlled that subsequent broader distribution. (*Id.*) The district court ignored this evidence of why Grand's early selective publication of her Letter was a private matter that did not constitute a matter of public interest as required by the NY Statute.

New York law does not elevate "mere gossip and prurient interest" into matters of public interest or concern. *Weiner v. Doubleday & Co.*, 74 N.Y.2d 586, 595 (1989). As such, "publications directed only to a limited, private audience are matters of purely private concern. *Huggins v. Moore*, 94 N.Y.2d 296, 303 (1999) (internal quotation and citation omitted). The matter cannot merely be "arguably" of public concern but must be "clearly so if it involves the public business." *Cottom v. Meredith Corp.*, 65 A.D.2d 165 (4th Dept. 1978). These principles derive from the New York Court of Appeals' holding in *Chapadeau*:

> [W]ithin the limits imposed by the Supreme Court where the content of the article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition, the party defamed may recover; however, to warrant such recovery he must establish, by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

38 N.Y.2d at 199. This logic applies here.

Grand tied her claims about Coleman to the "Me Too" movement. She even included incendiary reference to Harvey Weinstein as part of that. (JA.174.)

However, just because an individual claim may relate to a broader social issue does not turn such claims as a matter of law into a matter of public interest. *See Goldman v. New York Post Corp.*, 58 A.D.2d 769, 770 (1st Dept. 1977) (finding that it is a question of fact as to whether or not claims that plaintiff operated massage parlors became a matter of public interest; "[w]hile conditions in respect of the practice of prostitution are certainly 'within the sphere of legitimate public concern,' that factor alone is not dispositive of other issues inherent in this case."). The numerous exhibits in this case, particularly the sealed portions (JA.114-25; RoA.388-539.), shows that this matter involves an extensive, dense, and intensely private matter between two rather volatile people—a classic example of gossip and prurient interest.

Grand's deliberate attempt to couch her private grievances, which she aired in targeted, private correspondence, into a broader social narrative, does not transform her individual circumstances into a matter of public interest. The trial court held that Coleman "remains a prominent musician of interest to the jazz community," (JA.2543) with no factual findings. To accept the court's ruling is to catapult every private dispute into a matter of public concern because each tile forms part of a mosaic. That is not what *Chapadeau* held. As in *Goldman*, not every relationship rises to the level of public concern, no matter how titillating the facts may be.

The trial court erroneously failed to distinguish between each of Grand's publications based on their scope and nature of their circulation. Instead, the court

found that all of Grand's publications constituted one indivisible discussion of a public concern. Each publication should have been evaluated on its own merits to determine anti-SLAPP application with its malice standard, because each publication gives rise to a separate defamation claim. *Park Knoll Associates v. Schmidt,* 59 N.Y. 2d 205, 208 (1983). Certainly, Grand's initial limited distribution of her Letter and emails in the November 5-8, 2017 period to only a handful of people was by themselves a matter of private concern and should have been treated as such, if not the subsequent 43-person distribution that did not find its way into the press.[6]

The district court's "public concern" finding also rests on misapplied caselaw, starting with *Fairley v. Peekskill Star Corp*. What the *Fairley* court said was:

> A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way. . . **[E]ssentially private concerns or disagreements do not become public controversies simply because they attract attention**. . . Rather, a public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants . . . **To determine whether a controversy indeed existed and, if so, to define its contours**, the judge must examine whether persons actually were discussing some specific question. A general concern or interest will not suffice.

---

[6] The record is not clear as to just how many publications were made and what versions of the Letter were sent. Grand admitted to different versions and could not remember how many she sent out. (JA.264-75, 1223-25, 2526.) She further admits to another email recipient as to different versions. (JA.2100.)

83 A.D.2d 294, 298-99 (2d Dept. 1981) (quotations and citations omitted) (emphases added); *see also* (JA.2541). *Fairley* ultimately ruled for the defendant newspaper on very different facts. Grand's limited and selected communications describe a quintessential private controversy between her and another private person. Under the *Fairley* factors, the individual statements should have been evaluated as matters of private concern. Grand's mere mention of "Me Too" does not change her attack on Coleman into a matter of public interest. This is certainly true at least of what Grand said in her narrowly circulated November 5-8, 2017, comments.

The district court's error in finding public interest is punctuated by its contradictory reliance on *McKee v. Cosby*, 8674 F.3d 54 (1st Cir. 2017). (JA.2543, 2552.) Coleman is not Bill Cosby, neither in action nor in public status. As the court itself observed, Coleman was not enough of a player in the music industry to be a public figure, nor had he injected himself into a controversy to be a limited public figure. (JA. 2538.) These rulings are inconsistent with the district court's finding that Grand commented on a "public concern" simply because, without explanation, it found "sexual impropriety and power dynamics in the music industry, as in others, were indisputably an issue of public interest at the time Grand sent her email (JA.2542). The district court's conclusion (without cited authority) does not explain what the "music industry" is, what its public boundaries are, or how they should be drawn. Nor does the court's analysis factor Grand's limited initial circulation or the

34

prurient nature of her allegations. To affirm the district court's conclusion under these circumstances is to decimate the law of defamation, since any allegation of sexual harassment against anyone can be shoehorned into a discussion of public interest in the current socio-political realm.

## IV.   The district court erred in finding no genuine issue of material fact as to whether Grand's statements met the actual malice standard.

The district court held that on summary judgment, it could decide as a matter of law that no reasonable juror could find by clear and convincing evidence that from the objective facts it could be inferred that Grand's own actions or statements and "the inherent improbability of the story" cast subjective doubt as to the truth of her version. (JA.2543-44.) The Court rejected what it called Coleman's two proffers— the admission that it would be "legally dangerous" to publish and the threat to circulate the letter in the industry. (JA.2544-45.) In actuality, the record contains far more than two proffers. The district court erred when it failed to find questions of fact in constituting a plausible case of actual malice, and it erred by failing to consider the cumulative weight of Coleman's allegations. *See, e.g.*, *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 419 U.S. 657, 668 (1989) (holding "a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence"). Simply put, the district court erred by deciding as a matter of law the classic factual questions of Grand's intentions and her credibility.

35

This Court in *Celle v. Filipino Rep. Enterprises Inc*., 209 F.3d 163, 183 (2d Cir. 2000) made clear that "[e]vidence of ill will combined with other circumstantial evidence indicating that the defendant acted with reckless disregard of the truth or falsity of a defamatory statement may also support a finding of actual malice." In *Celle,* this Court found that circumstantial evidence indicated the defendant had serious doubts as to the truth of the allegations. *Celle* also states that "[m]alice may be proved inferentially." *Id*. at 183.

This Court, exercising *de novo* review on appeal, may search the record and is not limited to the trial court's findings. The thrust and actuality of the defamatory remarks made by Grand are that Coleman "sexually harassed" her. (JA.500-07, 2500.) That claim of harassment is somewhat euphemistic; as noted, the actual statements imply (if they do not expressly state) physically abusive behavior that boarders on assault. Grand admitted that she is a "calculative" person who used Coleman for ulterior purposes. (JA.338-39, 552, 1254.) This admission at a minimum creates an issue of fact as to the circumstances surrounding the relationship and casts doubt on the veracity of Grand's statement that Coleman sexually harassed her. These record admissions by Grand are critical. (JA.500-07, 2500, 338-39, 552, 1254.) The district court did not even mention the "calculative" remark, which goes directly to Grand's motivation and credibility, raising a jury

36

question as to whether she knew that her statements in the Letter and other publications were false (i.e. whether she acted with malice).

While "[t]he question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law," *Harte-Hanks Comm's, Inc.*, 491 U.S. at 685, where the record reveals a "plausible inference" that the defendant was "reckless disregarding the truth," the court should conclude that a reasonable factfinder could find malice. *Palin*, 940 F.3d at 815. That is exactly what the record reveals here in abundance.

As noted above, the district court ignored Grand's admission in her deposition that during the relationship Coleman never forced her to have sex: "Q. Do you allege at any time between June of 2011 and September of 2016 that Mr. Coleman forced you to have sex? A. I was not forced physically." (JA.1651.) This admission contradicts the focus of Grand's complaint that Coleman subjugated her to unwanted, non-consensual, forced sex as set forth in the Letter and the factual statements 3 through 7 above. Grand's admission also creates a factual question concerning the truth of her allegation that Coleman kissed her in her sleep with the intent to have forced sex. As a matter of law, there was enough in the record for the district court to realize these were questions for the jury. That is the standard under *Harte-Hanks* and *Palin.*

Writing about Coleman, Grand stated that "[a]bout 6 months after I moved to New York in 2011, he convinced me to be intimate with him"; "[b]y that point [in 2013], though, I wasn't in love with him anymore. I didn't want to be intimate with him anymore. That period is when the sexual harassment started;" and "[h]e would call me in the middle of the night and never take no for an answer." (JA.38-39, 1650-51.)

Contrary to these statements, and after the alleged period of harassment began, in 2015 Grand still pressed Coleman for a relationship, even after her left her. For example, Grand emailed Coleman "I miss you," in response to his statement that he is done with her. (JA.2356.) These raise significant questions as to whether she believed the allegations of sexual harassment were true or not, and should go to the jury.

Another document in the record, produced by Grand, appears to be a draft of the final Letter, which expressly mentioned Coleman by name, confirms that the alleged harassment occurred between 2013-2016, while Grand is still professing affection and contradicts her statement that "in the last three years of my interaction with him I have been sexually harassed and pushed into saying yes to sexual acts I did not want to do." (JA.2500 (emphasis added).) Since the parties admit that the interaction was between 2011 and 2016, this means that the alleged harassment occurred between 2013 and 2016. (*See* JA.228:2, 249:21-25, 250:1-3, 849:14-18.) It

38

further demonstrates a question of fact arising from Grand's assertions of sexual harassment on the one hand, and her regular pleadings to Coleman to continue the relationship, including even marriage, on the other hand during the operative 2013-2016 period.[7]

The common refrain throughout Grand's claims of sexual harassment was that Coleman initiated things and she felt she had no choice. (*See* JA.178-84, 2097.) and yet, as noted, Coleman told Grand that he was through with her and she still persisted. (JA. 2356.) To the contrary, there is her own admission that, when Coleman asks her on August 30, 2015 why she keeps coming back when she has "had plenty of opportunity to get away" and is engaging in "some kind of macabre game," she responded "[b]ecause I like it," to which Coleman replies "you r killing me" and "U have everyone thinking that it's me that won't leave u alone. Nobody suspects that little nice innocent young-looking Maria could be initiating anything." (JA.1486.)

Grand also admitted in a communication dated November 14, 2017 to Steve Rowland (a journalist) that she loved Coleman: "I never wanted to be in a relationship with someone that much older than me. It wasn't something I was

---

[7] A thorough review of the record, in particular the sealed portion found at (JA.376-87; RoA.388-539), would provide numerous other examples of the nature of the relationship. The record is dense with these statements. They become cumulative for the main point asserted above.

craving. But once I became intimate with him all the lines blurred and I felt that I needed him and I fell for him." (JA.2097.)

Grand's fears that her attack on Coleman would subject her to liability create another question of fact about her veracity and malice. It was error to find otherwise as a matter of law. Grand's admission that she "fell for him" contradicts her claims that she was sexually harassed long after the relationship began and was continuing. (*See id*.) It also raises questions as to Grand's credibility; despite testifying at her deposition that she "was not keen on the press being involving in this" and "that's why I sent my letter privately and not to a news outlet" (JA.414-15), Grand sent it to Rowland on November 14, 2017 (JA.2097-2102). On or about October 15, 2017, Grand posted on Facebook: "My favorite part about this Harvey Weinstein stuff is all of the guys in the shadows who are starting to worry a little bit. Yahhhh those skeletons are coming out people!" (JA.32.) Coleman testified that he understood Grand's May 17, 2017 email to be an overt threat. (JA.707:9-16, 708:9-15, 742:15-25, 743:2-3, 832:17-24, 834:8-23, 835:2-5, *see also* JA.77 at ¶ 31 (referring to the post as a "veiled threat").)

Grand peppered the record with self-serving statements which indicated her concerns. For example, on November 6, 2017, Grand wrote to Tamar Sella "...apparently it's very dangerous for me legally to post this, because then he can sue me for damages incurred if he loses any work, or for defamation. So i'm [sic] inching

40

towards posting the letter without mentioning his name (saying i [sic] can't name him and using a pseudonym). A lot of people will know it's him but it will protect me from any legal repercussions I think." (JA.1331-34.) The November 14 cover email that accompanied Grand's Letter states that "*it's legally dangerous for me to publish this* (even though I've removed any mention of names)." (JA.34, 1296-97 (emphasis added).) On November 17, 2017 Grand instructed Rowland to continue referring to Coleman as "X" because it is "what looks least like revenge..." (JA.1324-25.) Even the district court acknowledged that "Grand could theoretically have feared a defamation suit *because she knew her words were false*." (JA.2544 (emphasis added).) In another instance, the district court stated that "some of Grand's statements *are capable of being proven true or false*, and others are not." (JA.2547 (emphasis added).)

Another example of importance showing Grand's awareness of the falsity of her claims of sexual harassment is found in an otherwise unidentified document produced by Grand in discovery. (JA.2500.) It constitutes an admission by Grand that he has made such agreements with others:

> And yes when I've been offered to barter sex for lessons or sex for a gig I sometimes have said yes, although I was not feeling happy about in my real, authentic self. I did it because I felt I had to, and my point is that many times as women we feel we have to, in order to be accepted, to be successful, to please, to not lose a job, to not be completely broke, to not be kicked out of a band, etc, etc.

(JA.2500.)

41

There is enough factual contradiction in the record to warrant a juror to question Grand's credibility and find that subjectively, she knew her statements made in the Letter and her various other publications to private persons were false.

Given that the evidence of Grand's veracity and malice lends itself to competing interpretations, the district court should not have resolved the resulting credibility questions on summary judgment. This goes directly to the malice standard. Rather than allow a jury to determine credibility after hearing all the facts, the district court made an erroneous leap by concluding that the entire Letter was a matter of opinion whose credibility did not have to be decided by a jury.

In *Palin*, this Court recognized that actual malice can be established through the cumulation of circumstantial evidence:

> Palin's overarching theory of actual malice is that Bennet had a "pre-determined" argument he wanted to make in the editorial. Bennet's fixation on this set goal, the claim goes, led him to publish a statement about Palin that he either knew to be false, or at least was reckless as to whether it was false. The PAC contains allegations that paint a plausible picture of this actual-malice scenario. . . .
>
> . . . And that plausible inference of reckless disregard is strengthened when added to Palin's allegations that Bennet had reason to be personally biased against Palin and pro-gun positions in general. When properly viewed in the plaintiff's favor, a reasonable factfinder could conclude this amounted to more than a mistake due to a research failure.

940 F.3d at 813, 814-815.

The district court did not distinguish between common law malice and constitutional malice. Here, where statutory law is at issue, common law malice is

inapplicable; the inquiry is into Grand's attitude towards the truth. *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 99 (2d Cir. 2000) ("The critical difference between common-law malice and constitutional malice, then, is that the former focuses on the defendant's attitude toward the plaintiff, the latter on the defendant's attitude toward the truth."). The district court does not appear to have focused on the applicable malice standard: Grand's awareness that she falsified statements. Such should have been left to the jury. As held in *Meloff v. New York Life Ins. Co.*:

> [W]e find the evidence, viewed in the light most favorable to plaintiff, supports a finding of constitutional actual malice. Meloff spoke to her supervisor, Mellbye, when she learned there might be a problem with her charges, explained the situation, and gave him the check and her credit card. He reassured her, saying the charges were "no problem." Yet less than one week later, Mellbye sent an e-mail accusing Meloff of defrauding the company. The jury was entitled to find Mellbye seriously doubted Meloff committed fraud based on Meloff's testimony that when Mellbye heard her side of the story he reacted quite mildly. The jury heard testimony from Meloff and Mellbye and could draw its own conclusions regarding the credibility of each.

240 F.3d 138, 146-47 (2d Cir. 2001).

Cumulatively, Grand's conduct at least amounted to a purposeful avoidance of the truth, whereby she failed to check the truthfulness of her accusations despite materially misrepresenting the record of her interactions with Coleman. *See Curtis Publ'g v. Butts*, 388 U.S. 130, 156-57 (1967) (failure to investigate the truth of unreliable source's allegations may support finding of actual malice). These allegations, taken individually and certainly when considered cumulatively,

establish a plausible claim of actual malice. *See, e.g., Masson v. New Yorker Magazine, Inc.*, 510 U.S. 496, 511-25 (1991) (actual malice found where defendant deliberately alters source quote, "which alteration results in a material change in the meaning conveyed"); *Westmoreland v. CBS Inc.*, 596 F. Supp. 1170, 1176 (S.D.N.Y 1984) (malice may be established when defendant "knowingly or recklessly misstates the evidence to seem more convincing or condemnatory than it is" or if "it distorts statements of witnesses so that they seem to say more than in fact was said"). Grand's ill will towards Coleman betrays her malice and her lack of candor.

Grand admitted that no physical force was used against her. (JA.236, 250.) Grand admitted that she was calculative and manipulating. (JA.341, 354-55, 552.) Grand admitted that she said no to Coleman, the relationship ended, and she was able to walk away. (*See* JA.250, 316-17, 321, 325, 342.) Grand admitted this was not the first time she has been in such situations for personal gain. (*See* JA.354-55, 552, 560-61.) As pointed out below, Grand also admitted she was not forced into anything and that it was she who allowed any influence by Coleman. (JA.142-43, 115; RoA.396, 398-400.) It was not for the district court to summarily judge all of this and decide that there was no malice, that there was no question as to Grand's awareness of the falsity of her defamatory statements.

Coleman is not asking this Court to believe him or Grand. That is for a jury to decide. Where the district court erred is in its minimization of the impact of Grand's

many material contradictions, and the doubt these cast on her motivation and veracity. Tellingly, Grand did not present her contradictory admissions. She knew that she was self-described as calculative and manipulating. (JA.341, 354-55, 552.) Grand knew, as she admitted on deposition, that Coleman never physically forced himself on her. (JA.236, 250-51.) Her admissions cited above include awareness that she used others, as here, for professional advantage by agreeing to have sex. (JA.354-55, 552, 560-61.) She shaped the defamatory statements in her echo chamber with persons not aware of what she herself knew, i.e., that they were false. (*See* JA.1313, 1316, 1329, 1331-48.) To the extent that malice looks to objective awareness of the falsity of Grand's statements, there is enough in the record for the district court to have allowed a jury to decide the factual question about Grand's motivation and her knowledge of what was true and false.

## V. The district court erred in finding as a matter of law that certain statements were opinion and not fact.

As this Court recognized in *Celle*, the elements of defamation under New York law are: (1) a written defamatory statement of fact of and concerning the plaintiff; (2) publication by defendant to a third party; (3) fault; (4) falsity of the defamatory statement; and (5) injury to plaintiff, either special damages or per se libel." 209 F.3d at 176; *see also Meloff*, 240 F.3d at 145. *Celle* also notes the four factors that are used to determine if a statement is fact or opinion, namely, (1) "an assessment of whether the specific language in issue has a precise meaning which is

45

readily understood or whether it is indefinite and ambiguous"; (2) "a determination of whether the statement is capable of being objectively characterized as true or false"; (3) "an examination of the full context of the communication in which the statement appears"; and (4) "a consideration of the broader social context or setting surrounding the communication including the existence of any applicable customs or conventions which might signal to readers or listeners that what is being read or heard is likely to be opinion, not fact." *Celle,* 209 F.3d at 178-79. The district court applied these principles relying almost exclusively on *Gross v. New York Times*, 82 N.Y. 2d 146 (1993), which did not address at all sexual harassment claims, while ignoring New York expressly holding that allegations of sexual harassment are defamatory and not opinion. (JA.2546-50.)

The defamatory meaning of each of Grand's statements can be proven false. Grand's statement that "I have been sexually harassed and pushed into saying yes to sexual acts I did not want to do" is an express allegation of sexual harassment. (JA.2500). Grand admitted that Coleman never physically forced her to have sex. (JA.250, 1650-51.) The issue of whether one was sexually harassed has been held to be factual, capable of proof, and is not a matter of opinion under New York law. *See Alianza Dominicana, Inc. v. Luna*, 229 A.D.2d 328, 329 (1st Dept. 1996), *mot. for leave to app. dism.,* 89 N.Y.2d 1029 ("In our view, when the plaintiff's claims arising out of defendant Luna's accusations of sexual harassment and sexual abuse are

46

considered in light of these factors, they are susceptible of a defamatory meaning and would have been understood by a reasonable viewer to be assertions of provable fact. Thus, notwithstanding the cautionary language used by Luna, such as 'they say' or 'rumor in the streets say', these particular statements are actionable and the plaintiff's defamation action should not be dismissed at this juncture [of summary judgment].") (internal citations, quotations and alterations omitted).

Grand's statements also impute a lack of integrity to Coleman as her tutor, which are actionable and not opinion. "Where the author of a derogatory statement of opinion implies that it is based on facts not disclosed to his audience, a claim for defamation may be premised on this implied factual assertion." *Chiavarelli v. Williams*, 256 A.D.2d 111, 113 (1st Dept. 1998). In *Chiavarelli*, as here, the parties were in a mentor-mentee relationship (senior physician vs. resident physician). *Id.* at 111-12. The defendant sent a letter to plaintiff's supervisors which "claimed that plaintiff had given him a negative evaluation to retaliate for defendant's failure to respond to plaintiff's sexual advances." *Id.* at 112. The letter in *Chiaverelli* identified acts of harassment to be "inappropriate personal gifts to defendant, flirtatious comments about defendant's physical attributes, numerous invitations to travel with plaintiff or have dinner with him, and unwanted physical contact." *Id.* The court held these statements libel per se. *Id.* at 114.

47

Within the Eastern District itself at least one court also has found that a statement that the defendant had been "'subjected to unwanted and unwarranted sexual harassment'" by plaintiff had "a precise meaning, [is] capable of being proven false, and [is] likely to be taken as facts in the context in which [it] were shared." *Menaker v. C.D.*, No. 217CV5840DRHAYS, 2018 WL 5776533, at *5 (E.D.N.Y. Nov. 1, 2018). Other statements, analogous to those here, have also been found to be factual and not opinion. *See James v. DeGrandis*, 138 F. Supp. 2d 402, 415 (W.D.N.Y. 2001) (statement accusing history of sexual misconduct was defamatory and court rejected summary judgment motion to dismiss this claim). None of these cases were cited by the district court in its determination that an allegation of sexual harassment was "opinion." (JA.2546-50.)

The district court ignored this law. Instead, it cited the unreported decision of *Cummings v. City of New York*, No. 19-cv-7723, 2020 WL 882335 (S.D.N.Y. Feb. 24, 2020), which did not involve any statement of sexual harassment, but ignored the case in its own district that expressly addressed the exact kind of statement at issue here. (JA.2547.)

In short, the district court relied on cases for the broad principles relating to determination of fact versus opinion, while ignoring two reported appellate level decisions in New York. The district court also ignored the admonition of the New York Court of Appeals that hyper technical parsing of a possible "fact" from its plain

48

context of "opinion" loses sight of the objective of the entire exercise, which is to assure that—with due regard for the protection of individual reputation—the cherished constitutional guarantee of free speech is preserved. *Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 256 (1991).

The allegations made here were made to Coleman's peers in the jazz music world. (JA.1313, 1316, 1329, 1331-34.) They go to the core of his professionalism. For example, certain statements accused Coleman of expressly insisting on a quid pro quo that linked work performance to demands for sex. (JA.1474-75, 2500.) Such statements are defamatory per se when they accuse an individual of misconduct or unfitness in their profession. *See Gatz v. Otis Ford, Inc.,* 262 A.D.2d 280 (2d Dept. 1999). The district court essentially relied on claims based on first-hand knowledge but ignored Grand's admissions in emails. The district court stated that a revenge motive does not show actual malice, though it admitted that ill will can occasionally support a finding of malice. (JA.2543-45.)[8] Looking at Grand's Letter accusation that Coleman sexually assaulted her by kissing her on the lips as she slept (JA.1476), the district court dismissed this allegation's defamatory nature because Coleman "gave up" after Grand woke up and refused his advance. (JA.2548.) Grand's answers

---

[8] In this regard, Coleman brought to the Court's attention Grand's unsupported and malicious statements as to Coleman's alleged treatment of his ex-wife, which also raise a serious question not only as to Grand's motivations but also her state of mind in preparing the attack on Coleman. (JA.2484, 2490.)

to interrogatories characterized this incident as an example of sexual harassment or abuse. (JA.1676-77 at No. 10.) Rather than focus on the defamatory nature of the alleged assault, the trial court dismissed this allegation because Coleman "gave up" after refusal. (JA.2548.) It is the claim of assault that is actionable if it is false, not whether Coleman "gave up."

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's application of the NY Statute, vacate the judgment dismissing Coleman's claims and remand for proceedings consistent with this opinion.

50

Dated: July 7, 2021                         Respectfully submitted,


                                            */s/ Steven M. Richman*
                                            Steven M. Richman
                                            Clark Hill PLC
                                            830 Third Avenue, Suite 200
                                            New York, NY 10022
                                            Telephone: 609-785-2911
                                            Fax: 609-785-2999
                                            srichman@clarkhill.com

                                            Giel Stein
                                            Clark Hill PLC
                                            130 Randolph St., Suite 3900
                                            Chicago, Illinois 60601
                                            Telephone: 312-517-7520
                                            Fax: 312-985-5979
                                            gstein@clarkhill.com

                                            Elizabeth F. Griffin
                                            Clark Hill PLC
                                            901 Main Street, Suite 6000
                                            Dallas, Texas 75202
                                            Telephone: 214-651-2037
                                            Fax: 214-659-4170
                                            egriffin@clarkhill.com

                                            *Counsel for Appellant*
                                            *Steven Douglas Coleman*

## CERTIFICATE OF SERVICE

I, Steven Richman, hereby certify that on July 7, 2021, I served a copy of the Opening Brief of Plaintiff-Appellant Steven Douglas Coleman, along with the accompanying Joint Appendix by filing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Steven Richman*
Steven Richman

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limits of Fed. R. App. P. 32 and Local Rule 32.1 because, excluding the parts of the document exempted by Fed. R. App. R. 32(f), this document contains 12,364 words.

This brief complies with the typeface and type style requirements because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

Dated: July 7, 2021

*/s/ Steven Richman*
Steven Richman

CLARKHILL\K3597\421993\263402005.v5-7/6/21

# No. 21-800

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

_____

STEVEN DOUGLAS COLEMAN,
*Appellant,*
v.
MARIA KIM GRAND,
*Appellee.*

_____

**SPECIAL APPENDIX**
**Volume 1 of 1 (SPA-1 – SPA-41)**

_____

**Table of Contents**

| ECF No. | Document Title | SPA Pages |
|---|---|---|
| 106 | Memorandum and Order on Motions for Summary Judgment | 1-31 |
| 107 | Judgment | 32 |
| | NY Civ. Rights Law § 76-a | 33-34 |
| | NY Civ Rights Law § 70-a | 35-36 |
| | NY CPLR 3211 | 37-39 |
| | NY CPLR 3212 | 40-41 |

SPA-i

Respectfully submitted,


*/s/ Steven M. Richman*
Steven M. Richman
Clark Hill PLC
830 Third Avenue, Suite 200
New York, NY 10022
Telephone: 609-785-2911
Fax: 609-785-2999
srichman@clarkhill.com

Giel Stein
Clark Hill PLC
130 Randolph St., Suite 3900
Chicago, Illinois 60601
Telephone: 312-517-7520
Fax: 312-985-5979
gstein@clarkhill.com

Elizabeth F. Griffin
Clark Hill PLC
901 Main Street, Suite 6000
Dallas, Texas 75202
Telephone: 214-651-2037
Fax: 214-659-4170
egriffin@clarkhill.com

*Counsel for Appellant*
*Steven Douglas Coleman*

CLARKHILL\K3597\421993\263403290.v1-7/6/21

## <u>CERTIFICATE OF SERVICE</u>

I, Steven Richman, hereby certify that on July 7, 2021, I served a copy of the Opening Brief of Plaintiff-Appellant Steven Douglas Coleman, along with the accompanying Joint Appendix by filing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Steven Richman*
Steven Richman

CLARKHILL\K3597\421993\263403290.v1-7/6/21

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
Steven Douglas Coleman,                                    :
                                                           :
                                  Plaintiff,               :
                                                           :        MEMORANDUM & ORDER
                  -against-                                :
                                                           :        18-cv-5663 (ENV) (RLM)
María Kim Grand,                                           :
                                                           :
                                  Defendant.               :
------------------------------------------------------------ x

VITALIANO, D.J.

On October 10, 2018, plaintiff Steven Douglas Coleman commenced this action against

María Kim Grand, bringing a libel claim and requesting damages of at least $500,000 plus

attorney's fees.  Grand filed counterclaims alleging libel and intentional infliction of emotional

distress (IIED).[1]  The parties have cross-moved for summary judgment on their respective

claims.  For the reasons that follow, both parties' libel claims and Grand's IIED claim fail as a

matter of law.

<u>Background[2]</u>

From 2011 to 2016, Coleman and Grand had what both parties characterize as a rocky,

on-and-off sexual relationship.  Coleman's libel claim arises from a November 2017 email Grand

circulated to around 40 friends and industry colleagues, describing her experiences in the

_____

[1] Grand also brought and dropped a claim for "loss of employment and/or other income."  *See*
Ans. to Am. Compl., Dkt. 25, ¶ 93–94; Def.'s Opp'n Mem., Dkt. 93, at 28 n.149.

[2] The relevant facts are drawn from the amended complaint, the parties' Local Rule 56.1
statements and their submissions on the motions for summary judgment, and are reviewed in the
light most favorable to the nonmoving parties.  *See Allstate Ins. Co. v. Hamilton Beach/Proctor
Silex, Inc.*, 473 F.3d 450, 456 (2d Cir. 2007).  Any factual disputes are noted.

1

relationship and her feeling that Coleman had used his age and status to harass and take advantage of her. *See* Am. Compl., Dkt. 22, ¶¶ 51–59; Grand Email, Dkt. 1-3; Grand Letter, Dkt. 1-4. Grand's libel counterclaim centers on, among other communications, an email Coleman sent to around 80 people in May 2018 saying her accusations were false, presenting his side of the story and including explicit text messages between the two. *See* Ans. to Am. Compl., Dkt. 25, ¶¶ 75–92; Coleman Email, Dkt. 87-3.

Grand, an aspiring young saxophonist, met Coleman, a prominent saxophonist, when she attended a 2009 workshop he gave in New York City. Pl.'s 56.1, Dkt. 82-1, ¶ 1. At this first encounter, Coleman was 52 years old and Grand was 17. Def.'s 56.1, Dkt. 85, ¶ 1. Grand, who was visiting the United States from her home in Switzerland, asked Coleman for a lesson and, after first saying he did not work with beginners, he agreed. Def.'s Mem., Dkt. 86, at 4–5. There is no dispute that they did not then begin a sexual relationship, though each says the other was pursuing one. *See, e.g.*, Coleman Tr., Dkt. 82-7, at 454:10–13; Grand Tr., Dkt. 82-6, at 33:22–23.

Grand moved to New York City in 2011, at which point she and Coleman did begin a sexual relationship, though they disagree about who initiated it. Grand Tr. at 34:21–35:8; Am. Compl. ¶ 12. The relationship was never exclusive—Coleman was married and saw other women, and Grand also had other relationships. Def.'s 56.1 ¶ 3. Grand would later say she felt pressured to have sex with Coleman in order for him to continue teaching and working with her, and to avoid his anger. Def.'s Mem. at 5; Grand Tr. at 109:17–110:13, 131:4–132:2. At the same time, she said she was in love with him, was "slightly manipulative" and sometimes initiated sex, which "was never physically forced." Def.'s Mem. at 5; Grand Tr. at 112:4–5. Coleman says the relationship was fully consensual, often with Grand pursuing him, and that he

helped her gain valuable work experience and an O-1 visa. Am. Compl. ¶¶ 10–17.

They split temporarily in 2013, following an argument Grand says was occasioned by Coleman's wife asking for a divorce. Pl.'s 56.1 ¶ 3; Grand Tr. at 111:10–21. Their relationship resumed in 2014 and continued on and off for the next two years with increasing antagonism, especially when they toured together. Grand Tr. at 85:24–86:16, 134:17–135:16; Coleman Tr. at 254:2–16. They had their final sexual encounter in September 2016. Grand Tr. at 57:17–58:21; Pl.'s 56.1 ¶¶ 5–6. As with much else, they disagree on who initiated it. Grand Tr. at 57:17–58:21, 60:18–25; Pl.'s 56.1 ¶¶ 5–6. In November 2016, Grand told Coleman's manager she no longer wanted to work with Coleman. Pl.'s 56.1 ¶ 7. For the next year, they had little contact. Am. Compl. ¶ 27; Grand Tr. at 62:5–63:15.

In May and October 2017, Grand wrote in emails and texts to Coleman that she intended to speak publicly about her concerns with their relationship, centered on Coleman pursuing her despite the gap in their age and status. Pl.'s 56.1 ¶¶ 8–12. She posted on Facebook in October that, after former Hollywood producer Harvey Weinstein's arrest for sex crimes, she was glad "skeletons are coming out." Dkt. 1-2. Coleman apparently saw this post, and her other messages, as "threats." Am. Compl. ¶ 31; Pl.'s 56.1 ¶¶ 10–11. Grand, adding fuel to the fire, flat out denies that they were. Ans. to Am. Compl. ¶ 31. Grand also wrote an email to Coleman's estranged wife in November saying she intended to speak publicly. Pl.'s 56.1 ¶ 13.

These communications led up to the November 2017 email and letter at the heart of Coleman's claim. On November 5, 2017, Grand emailed seven friends, asking for help proofreading an open letter on her relationship with Coleman before she shared it more broadly. Pl.'s 56.1 ¶ 17; Dkt. 82-13 at 50. On November 17, Grand sent the finalized seven-page letter to around 40 people, mostly industry colleagues. *See* Grand Email. It recounted her history with

Coleman, but called him "X" because, she said, naming him would be "legally dangerous." *Id.* Grand said the letter described her "experience with" "sexism in the music industry," motivated by her desire to "start [] a larger conversation" on the subject. *Id.*

The letter Grand sent that lit the fireworks began by stating that she felt conversations on sexism were "long overdue," then detailed what she called an "abusive dynamic" and "sexual harassment" in her relationship with Coleman, focusing on the post-2013 period. Grand Letter at 2. She described various encounters she said disturbed her, such as waking up to find "X" in her hotel bed and having to convince him to leave. But, the letter also acknowledged that she had fallen in love with him and that she was grateful for their time together. *Id.* at 4, 6, 8. "Simply, the highs were very high and the lows were very low," she wrote. *Id.* at 4. Then circling back to where she had begun her letter, Grand claimed that, despite her anxiety and reluctance to "say something," she was "speaking out" to create change in the industry. *Id.* at 7–8.

Among the letter's statements Coleman challenges as defamatory are: "About 6 months after I moved to New York in 2011, he convinced me to be intimate with him"; "By that point [in 2013], though, I wasn't in love with him anymore. I didn't want to be intimate with him anymore. That period is when the sexual harassment started."; and "He would call me in the middle of the night and never take no for an answer." *Id.* at 4–5; Pl.'s Mem., Dkt. 83, at 10–14.

There appears to be no dispute that, as Coleman alleges, Grand authorized one of the email's recipients, Okkyung Lee, to share the letter with colleagues and journalists and name Coleman in doing so. Pl.'s 56.1 ¶ 19; Def.'s Reply 56.1, Dkt. 94, ¶ 19; Dkt. 82-13 at 14, 20, 24–25, 31. Nor is there a dispute that, on November 27, Grand named Coleman when sending the letter to seven members of the We Have Voice Collective, a group she and other artists launched "to bring awareness to issues of inequity, including but not limited to sexual harassment and

bullying" in the performing arts. Pl.'s 56.1 ¶ 18; Dkt. 82-13 at 2–3; Dkt. 87-16. Grand also sent

the letter to Coleman's wife, which is again undisputed. Pl.'s 56.1 ¶ 15; Def.'s Reply 56.1, ¶¶

15. His wife, Coleman says, knew it was about him. Pl.'s 56.1 ¶¶ 15, 22; Def.'s Reply 56.1, ¶¶

15, 22.

 Coleman claims he found out about Grand's email in January 2018. Coleman Tr. at

209:18–24. He testified that he lost band members as a result of it, and experienced

embarrassment and lost productivity. *Id.* at 193:21–194:9, 199:19–204:3; Pl.'s 56.1 ¶¶ 55–57.

He alleges that, to cope, he began receiving massages and seeing a psychotherapist. Coleman Tr.

at 180:3–181:23. He asserts that he lost work starting in October 2018. Pl.'s 56.1 ¶¶ 58–67;

Dkt. 82-12 at 8–28.

 Striking back, on May 5, 2018, Coleman emailed a letter of his own to around 80

people—forming the focus of Grand's counterclaims. *See* Coleman Email; Def.'s 56.1 ¶ 8; Ans.

to Am. Compl. ¶¶ 75–76. He selected recipients whom he thought had received Grand's letter,

though some had not. Coleman Tr. at 308:4–14, 312:5–12. He addressed the letter to the We

Have Voice Collective. Coleman Email at 2. He said he was "writing this letter to categorically

denounce [Grand's] accusation as false, and to appeal to you to hear both sides of the story

before reflexively rushing to judgment." *Id*. He said he was doing so now because, the week

before, one of the Collective's members had asked Coleman to leave a concert of Grand's, at her

request. *Id.* Like Grand's letter, Coleman's gave his version of the relationship. He said it "was

unusual, intense, argumentative, and passionate, but it was also completely consensual and

should have been private." *Id.* He said each pursued the other, and he never threatened Grand or

forced her to do anything, "which thoroughly refutes Maria's accusations of sexual harassment."

*Id.* He called her sexually aggressive and manipulative. *Id.* at 2–3. He included an "addendum"

5

with excerpts of his texts with Grand as "small examples of evidence," some explicitly sexual and others discussing their relationship or making plans. *Id.* at 4–9. Coleman also made a few statements over the following months on Facebook, in emails and to the media, defending his position and saying Grand's story was false. Ans. to Am. Compl. ¶¶ 77–84.

Coleman filed the instant case on October 10, 2018, making Grand's email and letter available on the Court's public docket. Compl., Dkt. 1. Beginning almost immediately, he lost numerous bookings and a teaching job. Pl.'s 56.1 ¶¶ 58–67; Coleman Decl., Dkt. 82-8, ¶ 48. In explaining their cancelations, however, venues cited the lawsuit, headlines about it and their institutions' related concerns. Dkt. 82-12 at 8–28. Coleman's expert estimates his losses topped $1.2 million. Pl.'s 56.1 ¶ 68; Kucsma Report, Dkt. 82-10, at 7. Similarly, Grand claims she lost work due to Coleman's statements, as well as during their relationship, when she alleges he only booked her if she slept with him. Ans. to Am. Compl. ¶¶ 93–94.

<u>Standard of Review</u>

Summary judgment shall be granted in the absence of a genuine dispute as to any material fact and upon a showing that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "[A] fact is material if it 'might affect the outcome of the suit under the governing law.'" *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of the City of New York*, 746 F.3d 538, 544 (2d Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). Courts do not try issues of fact at the summary judgment stage, but instead merely "determine whether there *are* issues of fact to be tried." *Sutera v. Schering Corp.*, 73 F.3d 13, 16 (2d Cir. 1995) (quoting *Katz v. Goodyear Tire & Rubber Co.*, 737 F.2d 238, 244 (2d Cir. 1984)).

The movant carries the burden of demonstrating there is no genuine dispute as to any material fact, *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005), and the motion court will resolve all ambiguities and draw all permissible factual inferences in the light most favorable to the party opposing the motion. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). Where the nonmoving party "will bear the burden of proof at trial," it bears the initial procedural burden at summary judgment of demonstrating that undisputed facts "establish the existence of [each] element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322–23. "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 33 (2d Cir. 1997). When the parties cross-move for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC*, 628 F.3d 46, 51 (2d Cir. 2010) (quoting *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)).

<u>Discussion</u>

Although Coleman and Grand disagree on most everything else, they both describe their relationship as rocky, with numerous highs and lows. Each recalls pursuing the other and being pursued, sometimes saying no and sometimes yes to a continued personal and professional relationship. Both sides agree that the encounters, retold in their briefing, were legal and consensual. Although the parties may parse the details of those encounters, all that is in issue is whether the dueling statements Grand and Coleman published about each other give rise to plausible claims of defamation and, in Grand's case, for intentional infliction of emotional harm,

and whether on any of them any party is entitled to summary judgment in the absence of any

dispute of material issue.

I.      Coleman's Defamation Claim

Coleman's single claim is that Grand's email and letter constitute defamation as a matter

of law.  Libel is defamation in writing or print.  *See Celle v. Filipino Reporter Enters., Inc.*, 209

F.3d 163, 176 (2d Cir. 2000).  Under New York law, which applies here, a plaintiff must

establish five elements to prevail on a libel claim:

1) a written defamatory statement of fact of and concerning the plaintiff;

2) publication by defendant to a third party;

3) fault;

4) falsity of the defamatory statement; and

5) injury to plaintiff, either special damages or *per se* libel.

*Id.*; *Meloff v. New York Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001).  Libel actions require

courts to consider both a plaintiff's interest in protecting one's reputation and society's interest in

preserving free speech rights.  *See Curtis Pub. Co. v. Butts*, 388 U.S. 130, 146–47, 87 S. Ct.

1975, 1991, 18 L. Ed. 2d 1094 (1967); *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct.

710, 11 L. Ed. 2d 686 (1964).  Therefore, even though defamation actions are created by state

law, they are not solely delimited by state law.  In fact, "the elements of a libel action are heavily

influenced by the minimum standards required by the First Amendment" and any additional free

expression protections afforded speech by the state constitution.  *Celle*, 209 F.3d at 176; *Immuno*

*AG. v Moor-Jankowski*, 77 N.Y.2d 235, 249, 566 N.Y.S.2d 906, 567 N.E.2d 1270 (1991).

These variable constitutional standards affect the fault and falsity analyses.  Libel

defendants who write about public figures and officials, or matters of public interest, receive the

JA.2533

protection of a heightened fault standard.  Under federal constitutional law, plaintiffs who are public figures must show defendants acted with actual malice, whereas private figures need only meet a gross negligence standard.  *Curtis Pub. Co.*, 388 U.S. at 155; *Sullivan*, 376 U.S. at 280; *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001).  For statements on matters of public concern, New York law has long required all plaintiffs to show defendants acted with gross irresponsibility and, as discussed below, recently imposed an actual malice standard in certain cases.  *See Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 101–02 (2d Cir. 2000) (quoting *Chapadeau v. Utica Observer–Dispatch, Inc.,* 38 N.Y.2d 196, 199, 379 N.Y.S.2d 61, 341 N.E.2d 569 (1975)); *Palin v. New York Times Co.*, No. 17-CV-4853 (JSR), 2020 WL 7711593, at *2 (S.D.N.Y. Dec. 29, 2020) (quoting N.Y. Civ. Rights. Law § 76-a).  Second, only falsifiable factual statements can be actionable libel.  Opinions are constitutionally protected.  *Immuno AG.*, 77 N.Y.2d at 254–55.  In deciding these issues, summary judgment on libel claims has "particular value" in avoiding the "chilling effect of protracted litigation."  *Id.* at 256.

A.      Fault[3]

The applicability of the actual malice fault standard depends on whether Coleman is a public figure and whether Grand spoke on a matter of public interest.  These are questions of law for the Court.  *See Celle*, 209 F.3d at 176; *Konikoff*, 234 F.3d at 106.

i.      General purpose public figure

A public figure is someone with "general fame or notoriety in the community, and

---

[3] The parties do not dispute that Grand's letter was of and concerning Coleman and that she published it to third parties.

JA.2534

pervasive involvement in the affairs of society." *Gertz*, 418 U.S. at 324. As previewed above, public figure status is a question of law for the Court that places the burden of proof on the defendant. *Krauss v. Globe Int'l, Inc.*, 251 A.D.2d 191, 192, 674 N.Y.S.2d 662 (1st Dep't 1998). If a plaintiff is classified as a public figure, he must then prove by clear and convincing evidence that the defendant acted with actual malice, defined as "knowledge of its falsity or reckless disregard for the truth." *Id.* at 342.

There are two types of public figures: general and limited purpose public figures. General purpose public figures are those who "occupy positions of such persuasive power and influence that they are deemed public figures for all purposes," and must therefore meet the actual malice standard for all libel claims. *Gertz*, 418 U.S. at 345. To qualify, the person's fame must be "very great; the individual must be a 'household name' on a national scale." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 270 n.8 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015), *and aff'd*, 622 F. App'x 67 (2d Cir. 2015) (quoting *Lluberes v. Uncommon Productions, LLC*, 663 F.3d 6, 20 n.14 (1st Cir. 2011)). It is the "rare person" who meets this test. *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 137 (2d Cir. 1984).

Grand argues Coleman has achieved sufficient fame as a musician to be considered a general purpose public figure. Def.'s Mem. at 39–40. Coleman began playing music in the 1970s, and has continued performing, touring, giving workshops and releasing albums since. Holzen Report, Dkt. 87-26, ¶ 16; Def.'s 56.1 ¶ 10; *see generally* Coleman Tr. He has received recognition for this work, including a MacArthur Fellowship, a Guggenheim Fellowship and awards from the Doris Duke Charitable Foundation. Holzen Report ¶ 17; Kucsma Report at 5; Coleman Tr. at 46:16–24. Local media coverage from 2015 and 2016 describes him as "a rising giant" in jazz and a recipient of "many awards." *See Morning Call* Article, Dkt. 96-2, at 3;

*Chicago Reader* Article, Dkt. 96-3, at 3.  In 2017 and 2018, publications ranked his albums as among the year's best jazz releases.  Def.'s 56.1 ¶ 9.  Tabloid headlines covering this litigation call Coleman a "famed" and "prominent" saxophonist.  Holzen Report ¶ 25; Dkt. 87-28.

These facts show Coleman has achieved notable success and recognition within the world of jazz—one he described as "small," Coleman Tr. at 309:4–9, and "underground," Dkt. 96-23 at 3—and the broader creative community.  Coleman has sought and attained public attention for his music, including by giving interviews to the media.  *See James v. Gannett Co.*, 40 N.Y.2d 415, 422, 386 N.Y.S.2d 871, 353 N.E.2d 834 (1976) (considering media access central to the public figure analysis); *Morning Call* Article; *Chicago Reader* Article.  To classify Coleman as a general purpose public figure, however, his celebrity must be greater than that of a successful musician "well known in some circles." *Mitre Sports Int'l Ltd. v. Home Box Office, Inc.*, 22 F. Supp. 3d 240, 249 (S.D.N.Y. 2014).  The Court does "not lightly assume" that Coleman's "participation in community and professional affairs render[s] him a public figure for all purposes."  *Gertz*, 418 U.S. at 352.  Instead, the Court requires a "clear showing" of fame, asking whether he is a "well-known celebrity" whose name is a "'household word.'"  *Horowitz v. Mannoia*, 10 Misc. 3d 467, 469, 802 N.Y.S.2d 917, 921 (Nassau Cty. Sup. Ct. 2005) (quoting *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1294 (D.C. Cir. 1980)).  As Grand has not sufficiently demonstrated that Coleman has reached this high level of celebrity and name recognition, Coleman cannot be classified as a general purpose public figure.

ii.    Limited purpose public figure

Depending upon the circumstances established in the record, a plaintiff can be classified as a limited purpose public figure if he "ha[s] thrust [himself] to the forefront of particular public controversies in order to influence the resolution of the issues involved."  *Gertz*, 418 U.S. at 345.

11

When such a plaintiff challenges a defendant's statements concerning that controversy as defamatory, to succeed he must show the defendant acted with actual malice. *Id.* at 342.

> For courts to categorize a plaintiff as a limited purpose public figure:
>
> A defendant must show the plaintiff has: (1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media.

*Lerman*, 745 F.2d at 136–37.

Grand does not contend that Coleman meets this test, arguing instead that he is a public figure for all purposes. In any event, Grand fails at the first factor. There is no evidence that, prior to Grand's email, Coleman successfully sought public attention and influence for his views on matters arguably related to this litigation, such as his relationships, relationships generally or sexual harassment allegations. The record reflects only that Coleman sought and received attention for making music. *Cf. Lerman*, 745 F.2d at 137 (plaintiff was limited purpose public figure in case involving mislabeled nude photos because she had "voluntarily devot[ed] herself to the public's interest in sexual mores, through extensive writing on this topic"); *Pisani v. Staten Island Univ. Hosp.*, No. 06-CV-1016 (JFB) (MLO), 2008 WL 1771922, at *16 (E.D.N.Y. Apr. 15, 2008) (plaintiff was private figure because "[d]efendants have failed to cite any facts showing that [plaintiff's] prominence was related to the topic of the [defendant's] statement"); *Naantaanbuu v. Abernathy*, 816 F. Supp. 218, 225 (S.D.N.Y. 1993) (plaintiff who "sought out the press on matters completely unrelated" to alleged defamation was private figure).

Further, while Grand's email addressed an existing public controversy—as "part of broader discussions regarding sexual assault, sexual harassment and consent in workplaces across the country," *Elliott v. Donegan*, 469 F. Supp. 3d 40, 53 (E.D.N.Y. 2020)—Coleman did

JA.2537

not voluntarily inject himself into and assume prominence in that controversy. Responding to Grand's email and bringing this action do not make him a public figure, nor does the fact that his attorney commented in one newspaper article. *See Time, Inc. v. Firestone*, 424 U.S. 448, 457, 96 S. Ct. 958, 966–67, 47 L. Ed. 2d 154 (1976) (participating in litigation generally insufficient to render plaintiff public figure); *Lluberes*, 663 F.3d at 19 ("[A]n individual should not risk being branded with an unfavorable status determination merely because he defends himself publicly against accusations."); *Lerman*, 745 F.2d at 136 (plaintiff "dragged unwillingly into the controversy" is not public figure). In this light, therefore, Coleman does not meet the test for classification as a limited purpose public figure. Consequently, because Grand has not shown Coleman to be either a general or limited public figure, for litigation purposes he must be treated as a private figure, which would require Grand to show she spoke on a matter of public interest in order to have the defamation claim lodged against her by Coleman adjudged by the more defense-friendly actual malice standard, as discussed below.

    iii.   <u>Matter of public interest</u>

Not missing a beat, Grand initially argued that, even if Coleman is not a public figure, her statements addressed a matter of public concern, requiring him to show she acted with gross irresponsibility. *See* Def.'s Mem. at 40 (citing *Chapadeau*, 38 N.Y.2d at 199). Seeking now to raise the bar even higher, Grand argues in a recent submission to this Court that New York's amended anti-strategic litigation against public participation ("anti-SLAPP") statute—which applies to communications on issues of public interest—has imposed a new standard that requires Coleman to show she acted with actual malice. *See* Def.'s Notice, Dkt. 105 (citing *Palin*, 2020 WL 7711593; N.Y. Civ. Rights. Law § 76-a).

It was an important tweak to New York law. New York courts have long held that, if a

JA.2538

defendant's allegedly defamatory statements involve a matter "arguably within the sphere of legitimate public concern," the plaintiff bears the burden of showing, by a preponderance of the evidence, that the defendant made those statements "in a grossly irresponsible manner." *Konikoff*, 234 F.3d at 101 (quoting *Chapadeau*, 38 N.Y.2d at 199). The state's protections for libel defendants speaking on public affairs increased on November 10, 2020, when amendments to New York's anti-SLAPP statute took effect. *See Palin*, 2020 WL 7711593, at *1–2. Indeed, New York's anti-SLAPP law has always imposed an actual malice standard in any "action involving public petition and participation." *Id.*; N.Y. Civ. Rights Law § 76-a(2). The old version of the law defined such actions narrowly, however, covering only those "brought by a public applicant or permittee." *Palin*, 2020 WL 7711593, at *2 (citing *Chandok v. Klessig*, 632 F.3d 803, 819 (2d Cir. 2011)). The amendments, among other changes, broadly expand that definition to include:

> (1) any communication in a place open to the public or a public forum in connection with an issue of public interest; or
> (2) any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition.

N.Y. Civ. Rights Law § 76-a(1)(a); *see also Palin*, 2020 WL 7711593, at *2.

The only court to have addressed this amendment thus far has it applies in federal court and has retroactive effect. *See Palin*, 2020 WL 7711593, at *3–4. This Court agrees. It is a hornbook rule that "federal courts sitting in diversity apply state substantive and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427, 116 S. Ct. 2211, 2219, 135 L. Ed. 2d 659 (1996). The anti-SLAPP provision at issue here, § 76-a, applies in federal court because it is "manifestly substantive," governing the merits of libel claims and increasing defendants' speech protections. *Id.*; *cf. La Liberte v. Reid*, 966 F.3d 79, 86 n.3 (2d

JA.2539

Cir. 2020) (finding California anti-SLAPP law's "special motion to strike" procedural); *Adelson v. Harris*, 774 F.3d 803, 809 (2d Cir. 2014) (finding Nevada anti-SLAPP law's provisions on immunity from civil liability and fee-shifting substantive); *Egiazaryan v. Zalmayev*, No. 11-CV-2670 (PKC), 2011 WL 6097136, at *12 (S.D.N.Y. Dec. 7, 2011) (applying New York's pre-amendment anti-SLAPP law in diversity jurisdiction case).

Having found § 76-a to be substantive and applicable in federal court, the question becomes whether that application can be retroactive. New York's statutory amendments "are presumed to have prospective application unless the Legislature's preference for retroactivity is explicitly stated or clearly indicated." *In re Gleason (Michael Vee, Ltd.)*, 96 N.Y.2d 117, 122, 726 N.Y.S.2d 45, 749 N.E.2d 724 (2001). New York, moreover, is in harmony with the general rule that legislation considered "remedial," "should be given retroactive effect in order to effectuate its beneficial purpose." *Id.* So, too, should legislation regarding which the Legislature "conveyed a sense of urgency," or aimed "to rewrite an unintended judicial interpretation." *Id.* Overall, these legislative statements must amount to a "'persuasive reason' for the 'potentially harsh' impacts of retroactivity." *Regina Metro. Co., LLC v. New York State Div. of Hous. & Cmty. Renewal*, 35 N.Y.3d 332, 375, 130 N.Y.S.3d 759, 154 N.E.3d 972, 995 (2020) (internal citation omitted).

The anti-SLAPP amendments are just such remedial, retroactive legislation. The memorandum accompanying the bill's introduction states that "as drafted, and as narrowly interpreted by the courts, the application of Section 76-a has failed to accomplish [its] objective." S52A Sponsor Mem. (July 22, 2020), https://www.nysenate.gov/legislation/bills/2019/s52. The memorandum expresses the specific intent that the proposed amendments will "better advance the purposes that the Legislature originally identified in enacting New York's anti-SLAPP law":

JA.2540

to protect the free exercise of speech, particularly in public fora on matters of public interest. *Id.* The bill became effective "immediately." *Id.* Under New York law, these clear legislative expressions of remedial purpose and urgency give the amendments retroactive effect. *See Palin*, 2020 WL 7711593, at *5 (quoting *Gleason*, 96 N.Y.2d at 123 ("These factors together persuade [the Court] that the remedial purpose of the amendment should be effectuated through retroactive application.")). Nor, furthermore, does retroactive application offend due process where, as here, plaintiff will face no "harsh impacts" from retroactive application. *See id.* at *5. Coleman has already hitched his wagon to the actual malice standard, which he claims to satisfy. *See* Pl.'s Mem. at 8–10.

Applying New York's amended anti-SLAPP law, the Court finds Coleman must prove Grand acted with actual malice because he brings "a claim based upon . . . lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest." N.Y. Civ. Rights Law § 76-a(1)(a). This interpretation is guided not only by the legislative intent of the amendment, but also by its directive to construe "public interest" broadly, as encompassing all but purely private matters. S52A Sponsor Mem. The Court is guided by this legislative directive, as well as the New York courts' "extremely broad interpretation" of statements on "matters of public concern," which likewise receive heightened protections. *Albert v. Loksen*, 239 F.3d 256, 269 (2d Cir. 2001). In that regard, New York law considers a matter of public concern as "a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants." *Fairley v. Peekskill Star Corp.*, 83 A.D.2d 294, 298, 445 N.Y.S.2d 156 (2d Dep't 1981) (quoting *Waldbaum*, 627 F.2d at 1296). This includes "a matter of political, social, or other concern to the community," even if it does not "affect the general population." *Abbott v. Harris Publications,*

*Inc.*, No. 97-CV-7648 (JSM), 2000 WL 913953, at *7 (S.D.N.Y. July 7, 2000). That said, "publications directed only to a limited, private audience" are deemed by those same New York courts as "matters of purely private concern." *Id.* at 270 (quoting *Huggins v. Moore*, 94 N.Y.2d 296, 303, 704 N.Y.S.2d 904, 726 N.E.2d 456 (1999)). Following logically, statements falling "into the realm of mere gossip and prurient interest" are also deemed matters of private concern. *Weiner v. Doubleday & Co.*, 74 N.Y.2d 586, 595, 550 N.Y.S.2d 251, 549 N.E.2d 453 (1989).

Here, Grand defines the issue of public interest as "sexual impropriety and pressure in the music industry." Pl.'s Mem. at 40. The Court assesses the topic at the time of her allegedly defamatory statements. Grand sent her email and letter on November 17, 2017, amid the rising tide of public concern over workplace sexual harassment known as the #MeToo movement. Following the reporting of sexual assault allegations against Harvey Weinstein, "#MeToo catapulted into the public's consciousness in October 2017." *Elliott*, 469 F. Supp. 3d at 51. People began engaging in "widespread and difficult conversations about what constitutes inappropriate behavior in professional settings and how to construe consent in sexual relationships between prominent industry players and those seeking opportunities within that industry." *Id.* at 52. Against this backdrop, the Court finds that sexual impropriety and power dynamics in the music industry, as in others, were indisputably an issue of public interest at the time Grand sent her email.

Grand's email and letter marked her foray into these conversations. She quite clearly frames them as her contribution to the larger discussions occurring at the time of the #MeToo movement. Her email begins by saying she is joining the "talk[] about sexism in the music industry" by sharing her own experiences. Grand Email at 2; *see Huggins*, 94 N.Y.2d at 304 (finding articles on parties' divorce addressed matter of public concern by "show[ing] the greater

significance of [defendant's] personal story"). Her letter starts by saying she wants to "speak up" in part "for the sake of other young women." Grand Letter at 2. Coleman acknowledges this context, saying Grand wrote "as part of the broader #MeToo movement." Pl.'s Reply, Dkt. 92, at 8. Further adding to the public interest in Grand's statements, while Coleman does not have the household-name status that qualifies him as a general purpose public figure, he remains a prominent musician of interest to the jazz community. *Cf. McKee v. Cosby*, 874 F.3d 54, 62 (1st Cir. 2017) (finding sexual assault allegations against actor Bill Cosby were public controversy).

These findings set the litigation battlefield. Because Grand's statements were "lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest," Coleman must show she spoke with actual malice. N.Y. Civ. Rights Law § 76-a(1)–(2). This requires him to "establish[] by clear and convincing evidence that any communication which gives rise to the action was made with knowledge of its falsity or with reckless disregard of whether it was false." *Id.* § 76-a(2). Importantly, "[d]espite its name, the actual malice standard does not measure malice in the sense of ill will or animosity, but instead the speaker's subjective doubts about the truth of the publication." *Behar*, 238 F.3d at 174; *see also Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510, 111 S. Ct. 2419, 2429, 115 L. Ed. 2d 447 (1991) (actual malice "should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will").

In assessing the defendant's subjective doubts as to the publication's truth, a "court typically will infer actual malice from objective facts." *Celle*, 209 F.3d at 183. These facts may include "the defendant's own actions or statements, the dubious nature of his sources, [and] the inherent improbability of the story." *Id.* (quoting *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1293 (D.C. Cir. 1988)). Significant on this motion, courts may make this

determination on summary judgment, which should be granted if no reasonable factfinder could find, by clear and convincing evidence, that the defendant acted with actual malice. *See, e.g.*, *id.*; *Anderson*, 477 U.S. at 257.

Coleman argues that his claim satisfies the actual malice standard, making two proffers of evidentiary support. Pl.'s Mem. at 8–10. First, he points to a line in Grand's email saying "it's not public at the moment because it's legally dangerous for me to publish this (even though I've removed any mention of names)." *Id.* at 10 (quoting Grand Email at 2). Relatedly, he notes that Grand wrote in an email to a friend and colleague that she was not going to name Coleman because "I spoke with an attorney and apparently it's very dangerous for me legally to post this, because then he can sue me for damages incurred if he loses any work, or for defamation," and made similar statements to another friend. *Id.* (quoting Dkt. 82-13 at 52). Coleman claims that because it is known that speaking the truth is legal, Grand's statements show that she knew her words were false. *Id.* Second, he argues that by authorizing a different friend and colleague to circulate the letter within the industry and to journalists, and to name Coleman in doing so, Grand showed "her true motive was revenge." *Id.*; Dkt. 82-13 at 14, 20, 24–25, 31.

Neither of these proffers shows Grand acted with actual malice. While Grand could theoretically have feared a defamation suit because she knew her words were false, she could also have feared suit because she, and the attorney she consulted, believed Coleman might sue regardless of whether she spoke truthfully. Grand says just that—rooting her fears in her awareness that meritless defamation suits can be brought as "punishment," and saying she never had or voiced any concerns with her letter's truthfulness. *See* Def.'s Opp'n Mem., Dkt. 93, at 27; Grand Opp'n Decl., Dkt. 95, ¶ 24. Indeed, New York amended its anti-SLAPP law to counter the same phenomenon Grand cites: suits aimed at chilling speakers' public participation.

JA.2544

*See* S52A Sponsor Mem. Both theories are plausible but what is crucial is that Coleman offers

no facts proving, by clear and convincing evidence, that Grand knowingly or recklessly made

false statements. *See Anderson*, 477 U.S. at 254 ("[T]here is no genuine issue if the evidence

presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder

of fact to find actual malice by clear and convincing evidence.").

As to Coleman's argument that Grand was motivated by revenge when she authorized the

letter's circulation, this also does not show actual malice. Evidence of ill will can occasionally

support a finding of actual malice in combination with other clear and convincing evidence, but

"standing alone . . . [it] is not sufficient to establish actual malice." *Celle*, 209 F.3d at 183. The

actual malice standard focuses not "on the defendant's attitude toward the plaintiff," but rather

"on the defendant's attitude toward the truth," so Grand's feelings toward Coleman do not speak

to actual malice. *Konikoff*, 234 F.3d at 99. At any rate, authorizing a friend to share her letter

does not show she knowingly or recklessly disregarded the truth of that letter, just that she

wanted others to read it.

Grand further refutes a finding of actual malice by stating that she wrote her email and

letter only from first-hand knowledge, carefully edited it with friends before sending and, albeit

naively, hoped to contain its distribution. Def.'s Opp'n Mem at 27; Pl.'s 56.1 ¶ 17; Dkt. 82-13 at

50–69. At bottom, Coleman fails to meet his burden to show, by clear and convincing evidence,

that Grand acted with actual malice and, as a result, he cannot prevail on his defamation claim

against her.[4] But, importantly, it is not the only reason.

---

[4] Nor could Coleman show Grand acted grossly irresponsibly in sending her letter—the
longstanding fault standard applied to matters of public concern under New York law. *Konikoff*,
234 F.3d at 101. That standard is objective, requiring a plaintiff to show by a preponderance of
the evidence that the defendant spoke without "due consideration for the standards of
information gathering and dissemination ordinarily followed by responsible parties." *Id.*

JA.2545

B.       *Statements of Opinion*

Because falsity is an element of a libel claim, a statement must consist of falsifiable facts in order to be actionable.  Opinions, by contrast, are constitutionally protected.  *Gross v. New York Times Co.*, 82 N.Y.2d 146, 153, 603 N.Y.S.2d 813, 623 N.E.2d 1163 (1993).  Coleman argues Grand's statement consists of falsifiable, and false, facts about him, while Grand maintains she was sharing her subjective opinions on their relationship.  *See* Def.'s Mem. at 17–25; Pl.'s Reply at 2–6.  To determine which is correct, it must be asked "whether the reasonable reader would have believed that the challenged statements were conveying facts about the libel plaintiff."  *Immuno AG.*, 77 N.Y.2d at 254.  Although this question can prove difficult to answer, it is one of law, properly—and preferably—decided by the Court on summary judgment.  *Id.* at 256.  In this decisional framework, Coleman bears the burden to show the challenged statement is fact, not protected opinion.  *Celle*, 209 F.3d at 179.

To determine whether Grand's statements are protected opinion, the Court examines:

> (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proved true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Gross*, 82 N.Y.2d at 153 (internal citations and quotations omitted).

To begin, some of Grand's language has a precise meaning and some does not.  Taking, for example, her statements about meeting Coleman, "I met him at 17 at a workshop" clearly has a precise meaning, while "I also felt this really strong sexual vibe coming from him in the way

_____

(quoting *Chapadeau*, 38 N.Y.2d at 199).  Neither of Coleman's evidentiary proffers shows gross irresponsibility, especially given that Grand's motives are irrelevant under this objective standard.

JA.2546

he looked at me" does not. Grand Letter at 2. Second, some of Grand's statements are capable of being proven true or false, and others are not. For example, Coleman takes issue with her line, "About 6 months after I moved to New York in 2011, he convinced me to be intimate with him." *Id.* at 4. Yet whether Coleman persuaded Grand to sleep with him, as she says, or whether Grand pursued him to advance her career, as he says, is not determinable by this Court. These are "inherently subjective evaluations of intent and state of mind, which are matters not readily verifiable and intrinsically unsuitable as a foundation for defamation." *Cummings v. City of New York*, 2020 WL 882335, at *22 (S.D.N.Y. Feb. 24, 2020). Additionally, other statements are both verifiable and undisputed, such as the basic timeline of their relationship.

Third, the full context of Grand's email and letter supports a finding that readers are likely to consider them as opinion. In undertaking this critical, and dispositive, prong of the analysis, the Court is mindful that the "hypertechnical parsing of a possible 'fact' from its plain context of 'opinion'" imperils "the cherished constitutional guarantee of free speech." *Immuno AG.*, 77 N.Y.2d at 256. Importantly, an opinion does not become actionable because its author includes supporting facts. An opinion that offers "a full recitation of the facts on which it is based is readily understood by the audience as conjecture" and allows readers to make up their own minds, so is nonactionable. *Gross*, 82 N.Y.2d at 154. Conversely, an opinion that implies the existence of undisclosed facts is actionable, as readers are likely to assume those facts are unfavorable to the statement's subject. *Id.* at 153–54.

In evaluating the competing contentions, the summary judgment court first looks to "the full context of the communication in which the statement appears." *Id.* at 153. Grand frames her statements as personal opinions on her turbulent relationship with Coleman, and adds supporting facts. Her email begins, "There's been lots of talk[] about sexism in the music industry. I wrote

22

a long letter about my experience with it." Grand Email at 2. She writes that she hopes to "be the start of a larger conversation about what's acceptable and what's not." *Id.* She starts her letter similarly, writing "[t]here's been a lot of talk about sexism lately, and I feel that I should speak up about the way sexism has affected me." Grand Letter at 2. These statements create a context in which Grand's letter is read as describing her subjective experience, allowing readers to decide for themselves "what's acceptable."

Coleman counters that the letter cannot be read as opinion because it falsely alleges criminal sexual misconduct, pointing to Grand's mentions of "sexual harassment," an "abusive dynamic" and being a "victim," among similar statements. Pl.'s Reply at 3–4. Yet the letter's full context remains one of opinion supported by disclosed facts, and its language is more nuanced than Coleman claims. For example, Grand says, "I don't intend to cast myself as only a victim of the situation" but "I do want to shed light on the strange process that happens when you enter this type of abusive dynamic and how this dynamic is embedded in the sexism that goes through our society." Grand Letter at 2. This line is consistent with a letter sharing personal opinions on a difficult relationship and related societal issues.

Furthermore, Grand does not allege criminal, non-consensual sex, as Coleman claims. She describes experiencing "sexual harassment," but recounts only instances in which Coleman tried to convince her to have sex but gave up after she refused—not instances in which he persisted despite her refusal. And, Grand supports her assertion that she was harassed by disclosing relevant facts.[5] Even if she had alleged criminal conduct, and even though allegations

_____

[5] Coleman argues that Grand implied the existence of undisclosed facts by offering to show text messages to interested readers as "proof." Pl.'s Reply at 3–4. Yet by saying the texts are "proof for most of what [she] is talking about here," Grand implies that they support exactly the facts described in the letter, not some other set of undisclosed allegations. The law does not require that Grand include all primary source material, just that she recite the facts supporting her

of sexual harassment can be actionable, Grand's letter remains protected opinion.  Just as

"assertions that a person is guilty of 'blackmail,' 'fraud,' 'bribery' and 'corruption' could, in

certain contexts, be understood as mere, nonactionable 'rhetorical hyperbole' or 'vigorous

epithet[s]'" or, "even when uttered or published in a more serious tone," nonactionable if based

on disclosed facts and framed as "personal surmise built upon those facts," indeed a claim of

harassment supported by facts can be protected opinion.  *Gross*, 82 N.Y.2d at 155; *see also*

*Melius v. Glacken*, 94 A.D.3d 959, 961, 943 N.Y.S.2d 134 (2d Dep't 2012) (finding statement

that plaintiff was "extortionist" nonactionable where supported by factual statement that

"plaintiff's lawsuit was seeking an amount 'far in excess of the appraised value' of the

property.'").  Reading the language Coleman quotes in the context of the full letter—which

begins and ends by saying it is a personal narrative and adds supporting facts in the middle—

supports a finding that the letter is protected opinion.

Last, the Court pans out to review "the broader social context and surrounding

circumstances."  *Gross*, 82 N.Y.2d at 153.  Coleman contends that readers aware of the #MeToo

movement would see Grand's statements as factual, since the movement's "greatest weapon" is

making factual accusations "to out and ostracize sexual abusers."  Pl.'s Reply at 8.  Yet while the

movement inspired some to make factual, verifiable assault claims, it led others to opine on

complex topics like the role of sex in professional relationships.  From their first lines, Grand's

email and letter tell readers she is doing the latter, adding her narrative to industry-wide talks.

Additionally, "the surrounding circumstances make clear both that plaintiff and defendant[] have

had a turbulent relationship and that the recipients of the e-mail were aware of the ongoing

disputes between them," cutting against the notion that readers would see the email as conveying

---

opinions, which she does.  *Gross*, 82 N.Y.2d at 153.

JA.2549

objective truths. *Kidd v. Epstein*, 79 A.D.3d 650, 651, 915 N.Y.S.2d 38 (1st Dep't Dec. 28, 2010). Considering Grand's statements in all their context, the Court finds they are protected opinion as a matter of law. For this reason too, summary judgment must be awarded to Grand on Coleman's libel claim.[6]

II.    Grand's Defamation Counterclaim

Now, for the flip side, subject to the same legal standards used to evaluate his libel claim against her, Coleman moves for summary judgment on Grand's defamation counterclaim. Pl.'s Mem. at 16. Grand defends by arguing that two of Coleman's communications were defamatory. Def.'s Opp'n Mem. at 28–31; *cf.* Ans. to Am. Compl. ¶¶ 75–92. First in the spotlight is Coleman's May 5, 2018 email to over 80 recipients, addressed to the We Have Voice Collective, which asserted that Grand made "false accusations," "was consciously trying to manipulate emotions of sympathy from the recipients of her letter" and "deliberately left [] out" the "sexual aggression on her part." Def.'s Opp'n Mem. at 28 (quoting Coleman Email at 2–3). Coleman's communication explanation explained that he wrote to "stop the bullying, intimidation, black-balling and lying from continuing." *Id.* (quoting Coleman Email at 3). Second on Grand's target list is Coleman's October 24, 2018 Facebook post claiming Grand "covertly spread misinformation," "deliberately lied" about their relationship and "co-opt[ed] the very necessary, warranted and powerful #MeToo movement." *Id.* at 28–29 (quoting Dkt. 87-24 at 1). Coleman responds only that Grand did lie, so he did not defame her by saying so. Pl.'s Mem. at 16.

---

[6] Because the Court finds Coleman fails on the fault and falsity elements, it declines to reach the question of injury.

Here, too, the fact versus opinion distinction is dispositive.[7] Grand claims that, unlike her own letter, Coleman's is factual because it says she "ma[de] false accusations" of sexual harassment. Courts considering similar statements have found some actionable and others protected opinion, depending on their context. *See Giuffre v. Maxwell*, 165 F. Supp. 3d 147, 151 (S.D.N.Y. 2016); *Schmitt v. Artforum Int'l Magazine, Inc.*, 178 A.D.3d 578, 588, 115 N.Y.S.3d 291 (1st Dep't 2019).

Like Grand's letter, Coleman's uses both language that is capable of precise meaning and falsifiable, and language that is not. Some of the lines Grand challenges as libelous are unverifiable speculation on her motives, such as Coleman's statement that she "was consciously trying to manipulate emotions of sympathy from the recipients of her letter" by omitting her "sexual aggression." Def.'s Opp'n Mem. at 28 (quoting Coleman Email at 3); *see also Cummings*, 2020 WL 882335, at *22.

Also like Grand's letter, the letter's immediate and broader social context signal to readers that the letter contains opinion, not fact. *Gross*, 82 N.Y.2d at 153. Coleman introduces his letter by saying that while he had "hesitated in publicly telling my side of the story," he believed he "must speak up now or forever allow hers to be the only on-the-record narrative," giving readers "both sides of the story." Coleman Email at 2. He ends by inviting readers' responses, saying he "cannot control what each of you will think about this" but is "open to dialogue." *Id.* at 3. As in Grand's letter, this framing indicates to readers that Coleman is

---

[7] Unlike in the briefing on Coleman's claim, in the briefing on Grand's defamation counterclaim, the parties do not address the applicable fault standard. While Grand is not famous enough to be a general purpose public figure, her participation in the public controversy of the music industry's #MeToo movement could render her a limited purpose public figure on that topic. The burden to establish public figure status rests on the defendant, however, and Coleman has made no such showing here. *See Krauss*, 251 A.D.2d at 192.

JA.2551

offering his version of the story and expects readers to have their own views.

The social context bolsters this conclusion.  Coleman wrote to recipients of Grand's letter and others he thought had read it, so readers were likely aware of their rocky relationship and sharply divergent perspectives.  *See Kidd*, 79 A.D.3d at 651.  For any who were not, the letter provides this context, saying their relationship was "unusual, intense, argumentative and passionate" and "did not end well."  Coleman Letter at 2.  His references to the #MeToo movement, such as "the rights of individuals being accused," further signal that he is voicing his opinion on controversial topics.  *Id.* at 3.

Further, Coleman disclosed the facts supporting his assertion that Grand's claims were false.  The body of the letter describes consensual sexual encounters, and the "addendum" contains text messages with Grand about those encounters.  *Cf. McKee*, 874 F.3d at 63 (finding letter nonactionable because it "adequately disclosed the non-defamatory facts underlying [defendant's] assertions," including "citations to articles and other sources" and "extensive underlying facts").  Coleman does not imply the existence of undisclosed facts.  He says he has not included all of their texts, but readers would not expect him to, nor draw adverse inferences against Grand because he did not.  *See id.*; *Gross*, 82 N.Y.2d at 153.

In much the same way, Coleman's October 24 Facebook post is also protected opinion.  It is a mix of precise, falsifiable statements and vague, unverifiable allegations as to Grand's motives in "covertly spread[ing] misinformation" to "ruin my reputation."  Dkt. 87-24.  Coleman frames the post as one sharing his side of the story, saying he and Grand were "presenting our evidence" and respective "positions."  *Id.*  He shares his opinion on the #MeToo movement, calling it "very necessary" but accusing Grand of "co-opting" it.  *Id.*  He calls Grand's claims false, but discloses the supporting facts—this time by excerpting the complaint in this action.  He

includes almost all of the complaint, and correctly notes that it is a matter of public record, so does not imply the existence of undisclosed facts. With each of Coleman's challenged statements falling, like Grand's, into the category of nonactionable protected opinion, Coleman is entitled to summary judgment on Grand's defamation counterclaim.

Grand's counterclaim also fails as to the Facebook post under the same amended New York anti-SLAPP statute she invoked in her defense. Her claim is an "action involving public petition and participation," as it is based on a "communication in a place open to the public or a public forum in connection with an issue of public interest." N.Y. Civ. Rights Law § 76-a(1)(a); *see also id.* § 76-a(1)(b) (including counterclaims); *Palin*, 2020 WL 7711593, at *2. Facebook is a public forum within the meaning of New York's anti-SLAPP law, just as it is under other states', and Coleman posted on his public Facebook page, generating dozens of comments. *See* Dkt. 87-24; *Stark v. Lackey*, 136 Nev. 38, 42, 458 P.3d 342, 346 (2020) (finding Facebook public forum under Nevada's anti-SLAPP law); *Cross v. Facebook, Inc.*, 14 Cal. App. 5th 190, 222 Cal. Rptr. 3d 250, 258 (2017) (same, under California's, since Facebook and the pages at issue were "accessible to anyone who consents to Facebook's Terms"); *Cevetillo v. Lang*, No. 19-CV-6031687 (TRT), 2019 WL 7597451, at *5 (Conn. Super. Ct. Dec. 13, 2019) (same, under Connecticut's); *see also Packingham v. North Carolina*, 137 S. Ct. 1730, 1737, 198 L. Ed. 2d 273 (2017) (calling Facebook and other social networking sites the "modern public square"); *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019) (finding President Trump's use of his Twitter account created public forum). Coleman's post addresses the #MeToo movement which, as discussed above, is an issue of public interest. *See* Dkt. 87-24 at 1; *Elliott*, 469 F. Supp. 3d at 51. Grand therefore must prove by clear and convincing evidence that Coleman acted with actual malice—that he knowingly or recklessly made false

statements in his Facebook post.  N.Y. Civ. Rights Law § 76-a(2).  She fails to argue Coleman is

liable under any fault standard, so cannot meet her burden to show actual malice.  *Cf. Celle*, 209

F.3d at 183.  For this additional reason, Grand's defamation counterclaim fails as a matter of law.

III.    Grand's IIED Claim

    Last, Coleman moves for summary judgment on Grand's IIED claim, in which Grand

alleges he "repeatedly and continually attempted to intimidate and distress [her] because she

refused to engage in sexual acts with [him] and because she wrote the Letter."  Ans. to Am.

Compl. ¶ 95; Pl.'s Mem. at 17–19.  Under New York law, an IIED claim has four elements: "(1)

extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal

connection between the conduct and the injury, and (4) severe emotional distress."  *Bender v.

City of New York*, 78 F.3d 787, 790 (2d Cir. 1996).

    Clearly, IIED "is a highly disfavored cause of action under New York law, one that is

almost never successful."  *Collins v. Giving Back Fund*, No. 18-CV-8812 (CM), 2019 WL

3564578, at *14 (S.D.N.Y. Aug. 6, 2019).  Claims typically fail as a matter of law on the first

element.  *See Howell v. New York Post Co.*, 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 612 N.E.2d

699 (1993).  "'Liability has been found only where the conduct has been so outrageous in

character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be

regarded as atrocious, and utterly intolerable in a civilized society.'"  *Stuto v. Fleishman*, 164

F.3d 820, 827 (2d Cir. 1999) (quoting *id.* at 122).  Even showing a defendant acted with tortious,

criminal or malicious intent is insufficient.  *Id.* (quoting Restatement (Second) of Torts § 46 cmt.

d (1965)).

    Grand does not clear this high bar.  She claims Coleman used his age and prominence to

"manipulate" her into a sexual relationship; that he threatened her career, "withheld performance

opportunities" and "yelled at her" when she declined sex; and attended her shows "knowing that his presence would distress" her and refused to leave when asked. Ans. to Am. Compl. ¶¶ 96–98. She alleges that, after she wrote the letter, Coleman directed others to "repeatedly bully and threaten [her] with public legal action" in emails, texts and on social media, and engaged in "continued harassment." *Id.* ¶¶ 99, 103; Def.'s Opp'n Mem. at 31–32.

Grand correctly notes that sexual harassment can form the basis for an IIED claim, provided "the continuous nature of the conduct [] make[s] it so outrageous and extreme as to be actionable." *Bonner v. Guccione*, 916 F. Supp. 271, 276–77 (S.D.N.Y. 1996); Def.'s Opp'n Mem. at 31. However, "[a]cts which merely constitute harassment, disrespectful or disparate treatment, a hostile environment, humiliating criticism, intimidation, insults or other indignities" are insufficiently "outrageous" to constitute IIED. *Semper v. New York Methodist Hosp.*, 786 F. Supp. 2d 566, 587 (E.D.N.Y. 2011) (quoting *Stevens v. New York*, 691 F. Supp. 2d 392, 399 (S.D.N.Y. 2009)).

While the record shows Coleman and Grand had a difficult relationship that left lasting marks on each, it does not, as a matter of law, reflect acts meeting the exceedingly high bar required to constitute IIED. Further, to the extent Grand's IIED claim is based on alleged libel by Coleman or others responding to her letter, "defamatory statements generally cannot [be pleaded as] the extreme and outrageous behavior required" by New York law to assert an IIED claim. *Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 729 (S.D.N.Y. 2014). The Court therefore grants summary judgment for Coleman on Grand's IIED claim.

<u>Conclusion</u>

For the foregoing reasons, both parties' defamation claims and Grand's IIED counterclaim fail as a matter of law, and the respective cross-motions of the parties are resolved

correspondingly.  The Clerk of Court is directed to enter judgment accordingly and to close this case.

So Ordered.


Dated:   Brooklyn, New York
         February 22, 2021

                                        /s/ Eric N. Vitaliano
                                        ERIC N. VITALIANO
                                        United States District Judge

UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
STEVEN DOUGLAS COLEMAN,                                    JUDGMENT
                                                          18-CV-5663 (ENV)(RLM)
                              Plaintiff,

        -against-

MARIA KIM GRAND,

                              Defendant.
--------------------------------------------------------X

        A Memorandum and Order of the Honorable Eric N. Vitaliano, United States

District Judge, having been filed on February 26, 2021, granting summary judgment in favor of

Defendant Grand on Plaintiff's libel claim; granting summary judgment in favor of Plaintiff

Coleman on Defendant's defamation counterclaims; and granting summary judgment in favor of

Plaintiff Coleman on Defendant Grand's intentional infliction of emotional distress claim; it is

        ORDERED and ADJUDGED that Judgment is entered in favor of Defendant and

against Plaintiff on Plaintiff's libel claim; and in favor of Plaintiff Coleman on Defendant's

defamation counterclaim and on Defendant's intentional infliction of emotional distress claim.

Dated: Brooklyn, New York                       Douglas C. Palmer
        March 2, 2021                           Clerk of Court

                                        by:     _/s/ Brenna B. Mahoney_
                                                Brenna B. Mahoney
                                                Chief Deputy

1

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

McKinney's Consolidated Laws of New York Annotated
 Civil Rights Law (Refs & Annos)
  Chapter 6. Of the Consolidated Laws
   Article 7. Miscellaneous Rights and Immunities

McKinney's Civil Rights Law § 76-a

# § 76-a. Actions involving public petition and participation; when actual malice to be proven

Effective: November 10, 2020

Currentness

1. For purposes of this section:

(a) An "action involving public petition and participation" is a claim based upon:

(1) any communication in a place open to the public or a public forum in connection with an issue of public interest; or

(2) any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition.

(b) "Claim" includes any lawsuit, cause of action, cross-claim, counterclaim, or other judicial pleading or filing requesting relief.

(c) "Communication" shall mean any statement, claim, allegation in a proceeding, decision, protest, writing, argument, contention or other expression.

(d) "Public interest" shall be construed broadly, and shall mean any subject other than a purely private matter.

2. In an action involving public petition and participation, damages may only be recovered if the plaintiff, in addition to all other necessary elements, shall have established by clear and convincing evidence that any communication which gives rise to the action was made with knowledge of its falsity or with reckless disregard of whether it was false, where the truth or falsity of such communication is material to the cause of action at issue.

3. Nothing in this section shall be construed to limit any constitutional, statutory or common law protections of defendants to actions involving public petition and participation.

**Credits**

(Added L.1992, c. 767, § 3, eff. Jan. 1, 1993. Amended L.2020, c. 250, § 2, eff. Nov. 10, 2020.)

Notes of Decisions (46)

McKinney's Civil Rights Law § 76-a, NY CIV RTS § 76-a
Current through L.2021, chapters 1 to 49, 61 to 101. Some statute sections may be more current, see credits for details.

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

> McKinney's Consolidated Laws of New York Annotated
>   Civil Rights Law (Refs & Annos)
>     Chapter 6. Of the Consolidated Laws
>       Article 7. Miscellaneous Rights and Immunities

McKinney's Civil Rights Law § 70-a

## § 70-a. Actions involving public petition and participation; recovery of damages

Effective: November 10, 2020

Currentness

1. A defendant in an action involving public petition and participation, as defined in paragraph (a) of subdivision one of section seventy-six-a of this article, may maintain an action, claim, cross claim or counterclaim to recover damages, including costs and attorney's fees, from any person who commenced or continued such action; provided that:

(a) costs and attorney's fees shall be recovered upon a demonstration, including an adjudication pursuant to subdivision (g) of rule thirty-two hundred eleven or subdivision (h) of rule thirty-two hundred twelve of the civil practice law and rules, that the action involving public petition and participation was commenced or continued without a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification or reversal of existing law;

(b) other compensatory damages may only be recovered upon an additional demonstration that the action involving public petition and participation was commenced or continued for the purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of speech, petition or association rights; and

(c) punitive damages may only be recovered upon an additional demonstration that the action involving public petition and participation was commenced or continued for the sole purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of speech, petition or association rights.

2. The right to bring an action under this section can be waived only if it is waived specifically.

3. Nothing in this section shall affect or preclude the right of any party to any recovery otherwise authorized by common law, or by statute, law or rule.

**Credits**

(Added L.1992, c. 767, § 2. Amended L.2020, c. 250, § 1, eff. Nov. 10, 2020.)

Notes of Decisions (27)

McKinney's Civil Rights Law § 70-a, NY CIV RTS § 70-a

Current through L.2021, chapters 1 to 49, 61 to 101. Some statute sections may be more current, see credits for details.

---

**End of Document**                          © 2021 Thomson Reuters. No claim to original U.S. Government Works.

McKinney's Consolidated Laws of New York Annotated
Civil Practice Law and Rules (Refs & Annos)
Chapter Eight. Of the Consolidated Laws
Article 32. Accelerated Judgment (Refs & Annos)

McKinney's CPLR Rule 3211

Rule 3211. Motion to dismiss

Effective: November 10, 2020

Currentness

(a) Motion to dismiss cause of action. A party may move for judgment dismissing one or more causes of action asserted against him on the ground that:

1. a defense is founded upon documentary evidence; or

2. the court has not jurisdiction of the subject matter of the cause of action; or

3. the party asserting the cause of action has not legal capacity to sue; or

4. there is another action pending between the same parties for the same cause of action in a court of any state or the United States; the court need not dismiss upon this ground but may make such order as justice requires; or

5. the cause of action may not be maintained because of arbitration and award, collateral estoppel, discharge in bankruptcy, infancy or other disability of the moving party, payment, release, res judicata, statute of limitations, or statute of frauds; or

6. with respect to a counterclaim, it may not properly be interposed in the action; or

7. the pleading fails to state a cause of action; or

8. the court has not jurisdiction of the person of the defendant; or

9. the court has not jurisdiction in an action where service was made under section 314 or 315; or

10. the court should not proceed in the absence of a person who should be a party.

11. the party is immune from liability pursuant to section seven hundred twenty-a of the not-for-profit corporation law. Presumptive evidence of the status of the corporation, association, organization or trust under section 501(c)(3) of the internal

revenue code may consist of production of a letter from the United States internal revenue service reciting such determination on a preliminary or final basis or production of an official publication of the internal revenue service listing the corporation, association, organization or trust as an organization described in such section, and presumptive evidence of uncompensated status of the defendant may consist of an affidavit of the chief financial officer of the corporation, association, organization or trust. On a motion by a defendant based upon this paragraph the court shall determine whether such defendant is entitled to the benefit of section seven hundred twenty-a of the not-for-profit corporation law or subdivision six of section 20.09 of the arts and cultural affairs law and, if it so finds, whether there is a reasonable probability that the specific conduct of such defendant alleged constitutes gross negligence or was intended to cause the resulting harm. If the court finds that the defendant is entitled to the benefits of that section and does not find reasonable probability of gross negligence or intentional harm, it shall dismiss the cause of action as to such defendant.

(b) Motion to dismiss defense. A party may move for judgment dismissing one or more defenses, on the ground that a defense is not stated or has no merit.

(c) Evidence permitted; immediate trial; motion treated as one for summary judgment. Upon the hearing of a motion made under subdivision (a) or (b), either party may submit any evidence that could properly be considered on a motion for summary judgment. Whether or not issue has been joined, the court, after adequate notice to the parties, may treat the motion as a motion for summary judgment. The court may, when appropriate for the expeditious disposition of the controversy, order immediate trial of the issues raised on the motion.

(d) Facts unavailable to opposing party. Should it appear from affidavits submitted in opposition to a motion made under subdivision (a) or (b) that facts essential to justify opposition may exist but cannot then be stated, the court may deny the motion, allowing the moving party to assert the objection in his responsive pleading, if any, or may order a continuance to permit further affidavits to be obtained or disclosure to be had and may make such other order as may be just.

(e) Number, time and waiver of objections; motion to plead over. At any time before service of the responsive pleading is required, a party may move on one or more of the grounds set forth in subdivision (a), and no more than one such motion shall be permitted. Any objection or defense based upon a ground set forth in paragraphs one, three, four, five and six of subdivision (a) is waived unless raised either by such motion or in the responsive pleading. A motion based upon a ground specified in paragraph two, seven or ten of subdivision (a) may be made at any subsequent time or in a later pleading, if one is permitted; an objection that the summons and complaint, summons with notice, or notice of petition and petition was not properly served is waived if, having raised such an objection in a pleading, the objecting party does not move for judgment on that ground within sixty days after serving the pleading, unless the court extends the time upon the ground of undue hardship. The foregoing sentence shall not apply in any proceeding under subdivision one or two of section seven hundred eleven of the real property actions and proceedings law. The papers in opposition to a motion based on improper service shall contain a copy of the proof of service, whether or not previously filed. An objection based upon a ground specified in paragraph eight or nine of subdivision (a) is waived if a party moves on any of the grounds set forth in subdivision (a) without raising such objection or if, having made no objection under subdivision (a), he or she does not raise such objection in the responsive pleading.

(f) Extension of time to plead. Service of a notice of motion under subdivision (a) or (b) before service of a pleading responsive to the cause of action or defense sought to be dismissed extends the time to serve the pleading until ten days after service of notice of entry of the order.

(g) Stay of proceedings and standards for motions to dismiss in certain cases involving public petition and participation. 1. A motion to dismiss based on paragraph seven of subdivision (a) of this section, in which the moving party has demonstrated that

the action, claim, cross claim or counterclaim subject to the motion is an action involving public petition and participation as defined in paragraph (a) of subdivision one of section seventy-six-a of the civil rights law, shall be granted unless the party responding to the motion demonstrates that the cause of action has a substantial basis in law or is supported by a substantial argument for an extension, modification or reversal of existing law. The court shall grant preference in the hearing of such motion.

2. In making its determination on a motion to dismiss made pursuant to paragraph one of this subdivision, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the action or defense is based. No determination made by the court on a motion to dismiss brought under this section, nor the fact of that determination, shall be admissible in evidence at any later stage of the case, or in any subsequent action, and no burden of proof or degree of proof otherwise applicable shall be affected by that determination in any later stage of the case or in any subsequent proceeding.

3. All discovery, pending hearings, and motions in the action shall be stayed upon the filing of a motion made pursuant to this section. The stay shall remain in effect until notice of entry of the order ruling on the motion. The court, on noticed motion and upon a showing by the nonmoving party, by affidavit or declaration under penalty of perjury that, for specified reasons, it cannot present facts essential to justify its opposition, may order that specified discovery be conducted notwithstanding this subdivision. Such discovery, if granted, shall be limited to the issues raised in the motion to dismiss.

4. For purposes of this section, "complaint" includes "cross-complaint" and "petition", "plaintiff" includes "cross-complainant" and "petitioner", and "defendant" includes "cross-defendant" and "respondent."

(h) Standards for motions to dismiss in certain cases involving licensed architects, engineers, land surveyors or landscape architects. A motion to dismiss based on paragraph seven of subdivision (a) of this rule, in which the moving party has demonstrated that the action, claim, cross claim or counterclaim subject to the motion is an action in which a notice of claim must be served on a licensed architect, engineer, land surveyor or landscape architect pursuant to the provisions of subdivision one of section two hundred fourteen of this chapter, shall be granted unless the party responding to the motion demonstrates that a substantial basis in law exists to believe that the performance, conduct or omission complained of such licensed architect, engineer, land surveyor or landscape architect or such firm as set forth in the notice of claim was negligent and that such performance, conduct or omission was a proximate cause of personal injury, wrongful death or property damage complained of by the claimant or is supported by a substantial argument for an extension, modification or reversal of existing law. The court shall grant a preference in the hearing of such motion.

## Credits

(L.1962, c. 308. Amended Jud.Conf.1964 Proposal No. 6; Jud.Conf.1965 Proposal Nos. 5, 6; L.1965, c. 773, § 9; Jud.Conf.1973 Proposal No. 4; L.1986, c. 220, § 12; L.1990, c. 904, § 26; L.1991, c. 656, § 4; L.1992, c. 767, § 4; L.1996, c. 501, § 1; L.1996, c. 682, § 2; L.1997, c. 518, § 2, eff. Sept. 3, 1997; L.2005, c. 616, § 1, eff. Jan. 1, 2006; L.2020, c. 250, § 3, eff. Nov. 10, 2020.)

McKinney's CPLR Rule 3211, NY CPLR Rule 3211
Current through L.2021, chapters 1 to 171. Some statute sections may be more current, see credits for details.

McKinney's Consolidated Laws of New York Annotated
   Civil Practice Law and Rules (Refs & Annos)
      Chapter Eight. Of the Consolidated Laws
         Article 32. Accelerated Judgment (Refs & Annos)

McKinney's CPLR Rule 3212

# Rule 3212. Motion for summary judgment

Effective: December 11, 2015

Currentness

**(a) Time; kind of action.** Any party may move for summary judgment in any action, after issue has been joined; provided however, that the court may set a date after which no such motion may be made, such date being no earlier than thirty days after the filing of the note of issue. If no such date is set by the court, such motion shall be made no later than one hundred twenty days after the filing of the note of issue, except with leave of court on good cause shown.

**(b) Supporting proof; grounds; relief to either party.** A motion for summary judgment shall be supported by affidavit, by a copy of the pleadings and by other available proof, such as depositions and written admissions. The affidavit shall be by a person having knowledge of the facts; it shall recite all the material facts; and it shall show that there is no defense to the cause of action or that the cause of action or defense has no merit. Where an expert affidavit is submitted in support of, or opposition to, a motion for summary judgment, the court shall not decline to consider the affidavit because an expert exchange pursuant to subparagraph (i) of paragraph (1) of subdivision (d) of section 3101 was not furnished prior to the submission of the affidavit. The motion shall be granted if, upon all the papers and proof submitted, the cause of action or defense shall be established sufficiently to warrant the court as a matter of law in directing judgment in favor of any party. Except as provided in subdivision (c) of this rule the motion shall be denied if any party shall show facts sufficient to require a trial of any issue of fact. If it shall appear that any party other than the moving party is entitled to a summary judgment, the court may grant such judgment without the necessity of a cross-motion.

**(c) Immediate trial.** If it appears that the only triable issues of fact arising on a motion for summary judgment relate to the amount or extent of damages, or if the motion is based on any of the grounds enumerated in subdivision (a) or (b) of rule 3211, the court may, when appropriate for the expeditious disposition of the controversy, order an immediate trial of such issues of fact raised by the motion, before a referee, before the court, or before the court and a jury, whichever may be proper.

**(d) Repealed.**

**(e) Partial summary judgment; severance.** In a matrimonial action summary judgment may not be granted in favor of the non-moving party. In any other action summary judgment may be granted as to one or more causes of action, or part thereof, in favor of any one or more parties, to the extent warranted, on such terms as may be just. The court may also direct:

1. that the cause of action as to which summary judgment is granted shall be severed from any remaining cause of action; or

2. that the entry of the summary judgment shall be held in abeyance pending the determination of any remaining cause of action.

**(f) Facts unavailable to opposing party.** Should it appear from affidavits submitted in opposition to the motion that facts essential to justify opposition may exist but cannot then be stated, the court may deny the motion or may order a continuance to permit affidavits to be obtained or disclosure to be had and may make such other order as may be just.

**(g) Limitation of issues of fact for trial.** If a motion for summary judgment is denied or is granted in part, the court, by examining the papers before it and, in the discretion of the court, by interrogating counsel, shall, if practicable, ascertain what facts are not in dispute or are incontrovertible. It shall thereupon make an order specifying such facts and they shall be deemed established for all purposes in the action. The court may make any order as may aid in the disposition of the action.

**(h) Standards for summary judgment in certain cases involving public petition and participation.** A motion for summary judgment, in which the moving party has demonstrated that the action, claim, cross claim or counterclaim subject to the motion is an action involving public petition and participation, as defined in paragraph (a) of subdivision one of section seventy-six-a of the civil rights law, shall be granted unless the party responding to the motion demonstrates that the action, claim, cross claim or counterclaim has a substantial basis in fact and law or is supported by a substantial argument for an extension, modification or reversal of existing law. The court shall grant preference in the hearing of such motion.

**(i) Standards for summary judgment in certain cases involving licensed architects, engineers, land surveyors or landscape architects.** A motion for summary judgment, in which the moving party has demonstrated that the action, claim, cross claim or counterclaim subject to the motion is an action in which a notice of claim must be served on a licensed architect, engineer, land surveyor or landscape architect pursuant to the provisions of subdivision one of section two hundred fourteen of this chapter, shall be granted unless the party responding to the motion demonstrates that a substantial basis in fact and in law exists to believe that the performance, conduct or omission complained of such licensed architect, engineer, land surveyor or landscape architect or such firm as set forth in the notice of claim was negligent and that such performance, conduct or omission was a proximate cause of personal injury, wrongful death or property damage complained of by the claimant or is supported by a substantial argument for an extension, modification or reversal of existing law. The court shall grant a preference in the hearing of such motion.

**Credits**
(L.1962, c. 308. Amended L.1963, c. 533, § 1; L.1965, c. 773, § 10; L.1973, c. 651, § 1; Jud.Conf.1973 Proposal No. 5; L.1978, c. 532, §§ 1 to 3; L.1984, c. 827, § 1. Amended L.1992, c. 767, § 5; L.1996, c. 492, § 1; L.1996, c. 682, § 3; L.1997, c. 518, § 3, eff. Sept. 3, 1997; L.2015, c. 529, § 1, eff. Dec. 11, 2015.)

McKinney's CPLR Rule 3212, NY CPLR Rule 3212
Current through L.2021, chapters 1 to 171. Some statute sections may be more current, see credits for details.

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.